## BURKS v. SINCLAIR REFINING CO.
### No. 10122.

United States Court of Appeals
Third Circuit.

Argued March 24, 1950.

Decided July 27, 1950.

240

Harry E. Sprogell, Philadelphia, Pa. (Saul, Ewing, Remick & Saul, Philadelphia, Pa., on the brief), for appellant.

Isidor Ostroff, Philadelphia, Pa., for appellee.

Before BIGGS, Chief Judge, and MARIS and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is a diversity action. In his complaint appellee sued appellant (1) upon an alleged oral agreement between them whereby appellee was to erect on his own land a gasoline service station and appellant was to deliver to the station all necessary equipment for the handling of petroleum products; (2) upon an alleged written agreement between them entered into July 11, 1947, whereby appellant agreed to sell and appellee to buy gasoline and other petroleum products for one year from August 15, 1947 to August 15, 1948 (copy of agreement attached to complaint); (3) upon an alleged written agreement between them (called Equipment Rental Agreement) entered into August 15, 1947, whereby appellant agreed to deliver to appellee all necessary equipment for the handling of petroleum products and appellee agreed to pay $1 a year rental for same (copy of this agreement also attached to the complaint). Appellee said he erected the gas station and fulfilled the requirements of the written agreements but that appellant refused to deliver the station equipment or the petroleum products. He sought damages from appellant for loss of profits he otherwise would have derived from conducting the station and for his losses for the construction and erection of the station.

Appellee is a totally disabled veteran. His wife had conducted most of the negotiations in the matter for him. It was stipu-

lated that she testify in his place, appellant having the same right of cross examination as if appellee were the witness. Mrs. Burks said that prior to their purchase of a site for their gas station, about December of 1945, she talked with the Sinclair Company, speaking with George Kane, then a Sinclair salaried agent. As said agent, Kane controlled Sinclair's marketing operations in his territory, which apparently included the site the Burks had chosen for their station. According to Mrs. Burks, Kane told them how to build the building and gave them suggestions as to its size. After that, Burks signed a gasoline agreement with Sinclair dated July 11, 1947, which provided that Sinclair sell and appellee buy not less than 36,000 gallons of Sinclair gasoline nor more than 43,200 gallons during the year beginning August 15, 1947. This was executed for appellant. The latter also executed a dealer's permit whereby Sinclair, to whom appellee had leased his property, agreed that the latter was to operate a gasoline station there for the year beginning August 15, 1947, and pay Sinclair $3 a month rent. Sinclair also executed a rental of gasoline station equipment to appellee. This is dated August 15, 1947. There is in evidence a letter from appellant dated October 31, 1947, signed by its area manager, Keeler, returning to Burks "your copy of contract(s) as follows: 2072-R [the gasoline agreement] 731-D [the agreement for appellee to operate the station.] We are confident your relationship with our company will prove satisfactory and profitable to you and we assure you of our cooperation in the furtherance of our mutual interests." Keeler testified that the lease with appellee had been referred to the Sinclair New York office for legal approval and that the oil contract had not been signed for Sinclair through oversight or misdirection of papers. Other than in those "details", he agreed that Burks had been engaged to be a Sinclair dealer "under the terms of the contract." Burks completed his station building but Sinclair never did furnish him the equipment. In March, 1948, Sinclair, through a branch manager, advised Burks that it was not going to install the equipment.

The minimum and maximum amounts in the gasoline agreement were Kane's estimate of the quantity of gasoline that he, for Sinclair, thought Burks would sell in one year. Keeler agreed with those figures. The testimony is that the mark up was to be 4½¢ a gallon on the gasoline and 100% a gallon on the oil. The oil contract provided for Sinclair to furnish Burks a minimum of 250 gallons and a maximum of 500 gallons of oil, grease and lubricants for one year beginning August 15, 1947. There is testimony that Sinclair employees told Burks that Sinclair would supply all the grease, kerosene and coal oil he needed. There was no written agreement on this. Burks expected to do minor repairs and lubrication, sell accessories and "ice cream and candy and such little things as you see most gasoline stations have." Burks and his wife intended to work at the station. He had previous station experience, and they expected to obtain whatever other help they needed from Mrs. Burks' family.

Evidence in behalf of appellee tended to show that he had expended at least $595.56 especially for the purpose of making his building fit for use as a service station. After Sinclair had notified him that it did not intend to equip the station appellee "tried to have the building revised and changed into living quarters in order to rent it." He proved $290 expense in reconverting the premises.

The Trial Judge charged the jury that it must first decide whether there was a contract, and if there was, what, if any, was the damage suffered by Burks. The gasoline contract, with its figures as to total gallonage, was called to the jury's attention. The jury was told that there was no evidence to show the amount of profit on the oil or grease nor of the quantities likely to be sold. The luncheonette to be conducted in the station was mentioned in this connection and with the same inference. With reference to the testimony regarding the oil, grease and luncheonette, the Court said: "I will let you consider it for what bearing it might have on your over-all judgment as to the complete value of the contract."

The Court charged appellant's request reading: "If you find that the defendant is liable to the plaintiff in damages and if you are able to compute the profits which the plaintiff would have realized from operating a gasoline service station at this location during a period of one year from August 15, 1947, you must deduct from the gross amounts which you believe the plaintiff would have received for the sale of gasoline and other products all amounts which you believe the plaintiff would have had to expend in the operation of the service station such as wages, utility bills, repairs, depreciation of equipment and other similar items."

With reference to the expenses of converting into a service station and thereafter reconverting into a dwelling, the Court charged appellant's request as follows: "If you find that the defendant is liable to the plaintiff in damages the sum which you award to the plaintiff as damages in connection with the amount spent by the plaintiff for parts of the building which were peculiarly for use in a service station and in converting the building for use as a dwelling may not exceed $885.56."

■ Appellant argues that appellee did not show any measurable damage. It admits, as is the law, "to the extent that profit would be realized the contract right had a value". But it asserts that since the gas station was a new business, prospective profits would be necessarily speculative. We disagree. However, there is a question as to whether sufficient evidence was presented at the trial to furnish the jury with a proper basis for a determination of the net profits to be realized from the operation of the station for one year. Proof of the Sinclair estimate of the total gallonage for the year's contract was submitted in the case. The gross profit for this was also in evidence. As to expenses, Mrs. Burks did testify that the labor would be taken care of by her husband and herself, with help from her people. There was no testimony as to the cost of the operation of the station. It would seem that an approximation of this could be supplied. In other words, the proof of loss of profit on the gasoline sales, while it was not the speculative type of testimony frowned upon by the cases,[1] was incomplete. The jury was charged concerning the operative costs to be deducted but did not have sufficient evidence before it to enable it to arrive at an amount which would reasonably represent net profit on the estimated gasoline sales. On this point it should also be considered that all of the overhead could not be charged to the gasoline alone. The other phases of the business would be called upon to bear their proportionate share.

■ Sinclair intended to execute the same sort of contract for oil as it had entered into for gasoline. The area manager testified that it had been returned unsigned through mistake. The unsigned contract carries minimum and maximum amounts but there is no proof of the gross profit in money to which Burks would have been entitled. There is testimony that the percentage of profit was 100% and that if Burks bought oil for 50¢ a gallon he would sell it for $1. However, there is no evidence that these were the actual figures. Nor is there any affirmative estimate regarding the amount of oil Burks would sell, or testimony that the oil contract figures are in reality such estimate. In that situation we do not think that the Court was justified in letting the question of the amount of profit on the oil go to the jury "for what bearing it might have on your over-all judgment as to the complete value of the contract." The same conclusion must be arrived at regarding the grease and the luncheonette, as to both of which there was even less evidence.

1. The Pennsylvania law, which governs here, is well illustrated by the decisions in Massachusetts Bonding & Insurance Co. v. Johnston & Harder, Inc., 343 Pa. 270, 280, 22 A.2d 709 and Weinglass v. Gibson, 304 Pa. 203, 207, 155 A. 439. It will be borne in mind that in the instant matter, Sinclair, itself, in the gasoline contract, estimated the minimum amount of gasoline that it thought Burks would sell at his station. It can hardly be heard to object that its own calculation is not sufficient evidence of the fact to support a verdict.

■ Appellant contends that the expenses in connection with converting the building are not recoverable because they were mere preparation in anticipation of a later contract. To support the assertion that the conversion expenses were prior to the contract, appellant relies on the facts that the contracts for the rental of the Sinclair equipment and for the sale of gasoline were signed by Burks on August 7, 1947; "were submitted by the plaintiff to the defendant, and were received by the plaintiff again only on October 31, 1947." And attention is especially directed to the provision in the gasoline agreement that the instrument should not be binding upon the seller until signed by a district manager. The gasoline and dealership agreements[2] contain the following language: "This agreement made and entered into this 11th day of July, 1947, * * * ." Both documents state that, "This agreement shall continue in effect for one year beginning the 15th day of August, 1947." In addition the two contracts were not to be effective until signed by Sinclair. Viewing the contracts in the light of the evidence put forth at the trial, we are not prepared to ignore the stipulated date of entry of these contracts in determining the particular question before us. Once the contracts were signed their terms were such as to bind Sinclair, from the date of the instrument, for necessary expenditures in preparation for performance of the contracts, in the event of a breach by Sinclair. See Williston on Contracts, Vol. 1, Rev.Ed.1936, Section 210.

■ From the record it is impossible to say whether all of the expenses relating to the conversion of the premises into a Sinclair gas station, as testified to by Mrs. Burks, were incurred prior to July 11, 1947.[3] The total of those expenses, in evidence without objection, was $595.56. If the services embraced were rendered after the "creation" of the contract, they were concededly for the jury to pass upon[4] and "* * * they can fairly be regarded as part of the cost of performance in estimating profit and loss." Restatement of the Law of Contracts, Section 333. Appellee, of course, should only be permitted to recover for expenses representing items peculiarly suited for performing the contract. Williston on Contracts, Vol. 5, Rev. Ed.1937, Section 1363A. Comment on Section 333 of the Restatement of the Law of Contracts.

■ The cost of reconverting the premises into a dwelling, amounting to $290, was included in the sum of $885.56 which was given to the jury as the limit of Burks' possible recovery for converting and reconverting. The reconversion expense was in mitigation of his damage and recoverable. Regarding profits to appellee from the operation of his premises as a dwelling during the balance of the contract term, the only evidence in the record on this is testimony by Mrs. Burks of a talk she had with Messrs. Keeler and Schweiker, the latter a Sinclair branch manager. She said they told her that "If I rented anything, I wouldn't get anything." This was in an effort to persuade her to reinstate the Sinclair contract after suit had been started. As to this phase of the litigation, it should be specifically noted that on the retrial, below indicated, appellee's net profits, if any, in operating his premises as a dwelling during the balance of the contract term

2. The equipment rental agreement, according to its terms, was entered into August 15, 1947. The dealership contract, although not mentioned in the complaint, was made a part of its pleadings by Sinclair and was considered at length at the trial.

3. Plaintiff's exhibit P-6, titled "Receipts of Munson for $370", and which is for part of those expenses, has been lost and is not printed. The other evidence regarding this is insufficient to draw an inference as to its contents. The remaining three exhibits on this branch of the matter consist of a receipt dated August 21, 1947, which relates to a contract dated June 16, 1947, and two bills dated October 21, 1947.

4. Appellant states in its brief, "It was error therefore to permit the jury to pass upon any expenses incurred by the plaintiff until such time as he actually had a contract * * *."

should be deducted from his Sinclair contract profit.

The jury resolved the contract issue in favor of appellee, but as the record stands the question of appellee's damage simply cannot be disposed of at this time. In justice to both sides the case should be retried on all of its damage aspects.

The judgment of the District Court will be reversed and the case remanded for a new trial as to damages only. No costs to either party as against the other.