HENRY L. CROWLEY & COMPANY, Inc.
v.
UNITED STATES.
No. 549–52.

United States Court of Claims.
Oct. 8, 1958.

John Milton, Jr., Jersey City, N. J., and John L. Ingoldsby, Jr., Washington, D. C., for plaintiff. Milton, McNulty & Augelli, Jersey City, N. J., were on the briefs.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

LITTLETON, Judge.

Plaintiff brings this action to recover damages allegedly sustained by reason of the defendant's breach of a contractual obligation to remove Government-owned machinery and equipment from plaintiff's manufacturing plant in West Orange, New Jersey, within a 90-day period commencing September 10, 1946. The recovery sought is $2,350,000, or alternatively $2,735,809.97.

The Government has filed a counterclaim based in part upon an allegation that its machinery and equipment located in plaintiff's plant was damaged due to the plaintiff's failure to use ordinary care for the protection and preservation of such property, and in part upon an allegation that the plaintiff, without authority, used some of the defendant's machinery and equipment for a period of approximately two years. The total amount asserted in the counterclaim is $96,018.17.

■ The plaintiff was incorporated in 1928 under New Jersey law. Its principal place of business is West Orange, New Jersey. Bearing his name, the corporation was founded by Henry L. Crowley, a pioneer in specialized phases of the radio industry, e. g., the development, improvement, and manufacture of ceramic insulators and magnetic iron cores. Under Mr. Crowley's direction the plaintiff has been engaged continuously in the production of ceramics, iron cores, and related materials for use in the radio industry. Though plaintiff has supplied ceramics for spark plugs and other products used in the automotive industry, its principal customers prior to World War II were leading radio manufacturers: Zenith Radio Corporation, Philco, General Electric, and others.

From its inception until the outbreak of World War II, the plaintiff experienced a steady and profitable growth. For the period 1936–1940 the plaintiff's net sales aggregated $1,188,224.06 and its adjusted profit totaled $162,232.05— 13.65 percent of the total net sales for the 5-year period. The plaintiff's net operating profit ratio for this period was 13.03 percent (finding 4).

In early 1940 the plaintiff was approached by the Signal Corps of the United States Army with the request that plaintiff's plant facilities be converted exclusively to war production. To this the plaintiff agreed. The demands of war production thereafter indicated that substantial expansion of the plaintiff's manufacturing facilities would be justified. Accordingly, the plaintiff and the defendant's Defense Plant Corporation (DPC), a subsidiary

of the Reconstruction Finance Corporation, entered into a written "Agreement of Lease" on July 2, 1941.

Essentially, it was there provided that the plaintiff would convey to the DPC, at a mutually acceptable price, a tract of land adjacent to its manufacturing plant; that the plaintiff would sell certain of its machinery to the DPC; that an additional manufacturing plant would be constructed on the land to be conveyed, at the expense of the DPC; that the plaintiff, also at the expense of the DPC, would rehabilitate the machinery to be sold under the agreement and would purchase such additional machinery and equipment as might be required in the new plant or to supplement the machinery and equipment in the plaintiff's existing plant, and would install the rehabilitated machinery and the newly purchased machinery and equipment in either plant, depending on where it might be needed. The lease further provided that the land, the plant, and the machinery and equipment were to be leased to the plaintiff for a term ending July 1, 1946, unless terminated sooner.

Rental for the property so leased was to be based on a prescribed percentage of the plaintiff's aggregate net sales during each year of the lease (Finding 6 (b)).

The sixth paragraph of the lease provided in part as follows:

"* * * To the extent practicable, each item of Machinery shall be marked or stamped by Lessee [plaintiff] in a way satisfactory to Defense Corporation so as to indicate Defense Corporation's ownership therein."

In the 18th paragraph of the lease the following provision was set forth:

"Lessee [plaintiff] shall use reasonable care in the use and operation of the site, buildings and the Machinery to be provided hereunder and shall keep the same in good state of repair (ordinary wear and tear excepted), and upon the expiration, termination or cancellation

[sic] of this lease * * * Lessee shall forthwith yield, and place Defense Corporation in peaceful possession of the site and buildings and of all the Machinery to be provided hereunder free and clear of any liens and claims other than those resulting from claims against Defense Corporation; and if any of the Machinery shall be then located elsewhere than in the additional plant to be provided hereunder, Defense Corporation shall, in addition, have the right to remove, and upon the written request of Lessee, shall promptly remove, at its own expense, such Machinery, and if such removal shall not take place within sixty (60) days after such request, Lessee may remove the Machinery and place it in storage for the account and at the expense of Defense Corporation * * *."

On January 27, 1942, sale of the land and machinery to the DPC in accordance with the terms of the lease was made. Thereafter, construction of the new plant was begun. Following its completion, the new plant and the original plant owned by the plaintiff were operated by the plaintiff as a single unit, which the parties referred to as Plancor 157.

Generally, the machinery and equipment purchased by plaintiff on behalf of the DPC and installed in Plancor 157 was comprised of small, inexpensive lathes and drills of short life expectancies—considering the type of work for which they were to be used. However, some heavy types of equipment were acquired and installed in the plant. Of that nature were large presses that were sunk in foundations and kilns that were imbedded in concrete to a depth of from 8 to 10 feet. Also, in the new plant, water pipes, electrical wiring, and a dust-collecting system that included a large network of overhead pipes were installed.

To meet its obligation to account for the various machinery and equipment purchased under the lease, the plaintiff

entered invoices in a volume entitled the Asset Property Record.

The plaintiff became the primary source of supply of iron cores and radio-grade ceramics for military needs following execution of a contract with the Signal Corps of the United States Army calling for military consumption of the entire production of Plancor 157. The plaintiff's production thereafter increased. By 1944 its gross production amounted to approximately $4,000,000 per year.

At the war's end in 1945, the plaintiff began converting its manufacturing operations to peacetime production. Large scale manufacture of radio and television materials was contemplated. With this purpose in mind, the plaintiff began negotiations with the defendant for acquisition of the Government-owned plant and some of the Government's machinery and equipment at Plancor 157.

Following termination of lease on November 3, 1945, and while negotiations with the Government proceeded, the plaintiff continued in its operations at Plancor 157 under an interim agreement with the defendant (finding 10).

Negotiations continued until on or about July 1, 1946. Finally, on September 10, 1946, the parties signed a purchase agreement. The agreement called for the sale and conveyance to plaintiff of the Government-owned plant, including the land on which it was situated, and a large quantity of the machinery and equipment at Plancor 157. The purchase price was $455,941.71. Of the total purchase price, $80,000 was payable in cash and the balance of $375,941.71 was payable, with interest at the rate of 4 percent per annum in quarterly installments of $9,500 for a period of 10 years, when the remaining balance was to become payable. The indebtedness of $375,941.71 was to be covered by plaintiff's promissory note and secured by a purchase-money first mortgage on the realty and personalty included in the purchase agreement.

All of the Government-owned machinery and equipment at Plancor 157 was not included in the purchase agreement of September 10, 1946. With respect to that property, subparagraph (e) of paragraph 6 of the purchase agreement provided as follows:

"That the Seller [defendant] shall have a reasonable time, but not in excess of ninety (90) days from the closing of title and delivery of the deed, to remove from the premises, at Seller's expense, all items of personal property, machinery and equipment owned by the Seller and located in the premises and not included in this sale."

On the same day the purchase agreement was signed, September 10, 1946, the defendant executed and delivered to the plaintiff a bill of sale for the personalty and a quitclaim deed for the realty which were subject to the purchase agreement. Also, the plaintiff in compliance with the agreement gave its promissory note, secured by a mortgage, to cover the remainder of the purchase price. The required cash payment of $80,000 was made by the plaintiff prior to September 10, 1946.

The 90-day period during which the defendant was allowed to remove its remaining machinery and equipment from Plancor 157, as provided in subparagraph (e) of paragraph 6 of the purchase agreement of September 10, 1946, expired on December 9, 1946. However, none of the defendant's machinery or equipment was removed from Plancor 157 prior to the expiration of that period. Though written and oral requests were made by the plaintiff for action, the defendant did not begin actual removal of such machinery and equipment until July 1947, and removal operations were not completed until some time in late November or early December of 1947.

Approximately 40 percent of the machinery and equipment that the defendant was obligated to remove had been taken from the plant by the plaintiff and stored in a warehouse located some distance from the plant. These particular items of machinery and equipment were

754

later removed from the warehouse by the defendant in July 1947.

Until their removal by defendant, the machinery and equipment remaining in Plancor 157 were intermingled with machinery and equipment belonging to the plaintiff. Almost 16,000 square feet of plant production space, or somewhat less than half of the production space in Plancor 157, was occupied by the Government-owned machinery and equipment. To a substantial extent, they consisted of kilns, heavy presses, and other large items that were firmly affixed to the structure. However, there were many smaller items in the plant that could have been removed by plaintiff without undue difficulty and stored elsewhere.

Because of the presence in Plancor 157 of a large quantity of idle machinery and equipment belonging to the defendant for many months after December 9, 1946, the plaintiff was prevented from carrying out a rearrangement of its own machinery and equipment which it thought would accomplish greater efficiency in production.

Following the removal of the Government-owned machinery and equipment from Plancor 157, the plaintiff in late December, 1947 began to rearrange its own machinery and equipment in the plant, an undertaking which extended through 1948. Upon its completion there was an improvement in the quality of the plaintiff's products.

On or about June 9, 1947, the plaintiff had begun negotiations with the defendant for modification of the promissory note and mortgage which had been executed pursuant to the purchase agreement of September 10, 1946. On September 8, 1947, negotiations were also opened concerning the purchase of a substantial amount of the defendant's machinery that was scheduled to be removed from Plancor 157. These two series of negotiations were merged about November 1947, and continued for more than a year thereafter.

During the course of the combined negotiations there was some general discussion between the parties of a claim by plaintiff based on the defendant's failure to remove its machinery and equipment within the 90-day period provided under the purchase agreement of September 10, 1946. However, there was no specific discussion of a settlement of the claim or of its waiver by the plaintiff, except as the claim related to the machinery and equipment that the plaintiff was seeking to purchase.

On December 29, 1948, the negotiations culminated in an agreement for the purchase of additional machinery and equipment from the defendant, and an agreement modifying the promissory note and mortgage. Paragraph 10 of the latter agreement provided as follows:

"The Mortgagor hereby covenants and agrees that it is now the owner of the premises upon which the aforesaid Mortgage is a valid first lien to secure payment of the indebtedness of the Mortgagor to the Mortgagee above set forth; and that there are no defenses, offsets or counterclaims to said Promissory Note or Mortgage, and that the Mortgagor is fully authorized to execute these presents as such."

For purposes of this suit, the above modification agreement was the final contractual arrangement executed between the parties.

The present claim was filed on November 3, 1952. In its amended petition, the plaintiff alleges the following instances of damage sustained because of the asserted breach of the agreement of September 10, 1946, by the defendant: (1) failure to realize the net operating profit ratio of 13.03 percent, which the plaintiff had maintained during the period 1936–1940, on its net sales for the years 1947 and 1948; (2) failure to meet the demonstrated plant capacity of its facilities, conservatively estimated at $2,750,000 net sales per year, for the years 1947 and 1948, and the resultant loss of its normal profit for those years; and (3) loss of the favorable position which it had attained prior to the war as a supplier of major companies in the

electronics field. The plaintiff does not, however, assert a claim based upon the value of the plant space occupied by the defendant's machinery and equipment after December 9, 1946 (finding 28).

In opposing the plaintiff's claim, the defendant denies any obligation under the agreement of September 10, 1946, to remove any of the Government-owned machinery and equipment from Plancor 157. Defendant contends that, even if the contract required the removal by the defendant of its machinery and equipment, it is not liable for breach of the contract because (1) it was not solely responsible for the delay in removing the machinery and equipment; (2) the plaintiff failed to mitigate damages; (3) any claim the plaintiff may have had against the Government was released and waived; and, (4) the plaintiff has not established its claim for loss of profits. As indicated above, the defendant has also asserted a counterclaim in the amount of $96,018.17. In its counterclaim the defendant in part alleges that its machinery and equipment in Plancor 157 was damaged to the extent of $50,000 because of the plaintiff's failure to exercise ordinary care for the protection and preservation of such property, and also alleges that the plaintiff, without authority, used some of the Government's machinery and equipment for approximately two years. The reasonable value of the use of such property is alleged by the defendant to be $46,018.17.

Rather than pass upon the several issues raised by the Government in opposition to the plaintiff's claim, it would seem desirable to examine at once the final question advanced by the Government, i. e., whether the plaintiff has established, in any event, that the breach of the contract by the Government occasioned a loss of profits to the plaintiff's business for which the plaintiff is entitled to recover. We feel that the plaintiff has clearly failed in this regard.

As this court stated in its decision in Chain Belt Co. v. United States, 1953, 115 F.Supp. 701, 127 Ct.Cl. 38, 58, the recovery of lost profits as damages for breach of contract depends upon the initial showing that such loss is the immediate and proximate result of the breach. This is basic. Whether the loss of profits was within the contemplation of the parties, and, if so, whether there has been established a sufficient basis for estimating the amount of profits lost with reasonable certainty, are questions reached only where the plaintiff has established that its loss of profits is attributable to the defendant's breach.

In an attempt to meet this fundamental requirement, the plaintiff introduced evidence of its net sales and adjusted profits for the base years 1936 through 1940. After determining the percentage of adjusted profits to net sales for each of the five years, the plaintiff arrived at a net operating profit ratio for the base period of 13.03 percent. The plaintiff then proceeded to apply this ratio to its net sales for the year 1947 (a year marked by sales approximately 3½ times greater than the plaintiff's best prewar year) and 1948. Had the 1936–1940 ratio been realized in 1947 the plaintiff would have shown a profit of $144,980.45, rather than the loss of $74,916.34 which it actually sustained during that year. The difference between the loss sustained and the profit which the plaintiff claims could have been expected but for the presence in Plancor 157 of the Government's machinery and equipment, or $219,896.79, is presented by the plaintiff as the measure of the defendant's liability for the year 1947. The same manner of computation was applied by the plaintiff to the profit of $99,492.45 realized in 1948 in arriving at the figure of $179,554.54, which the plaintiff asserts it would have earned but for the aftereffects of the defendant's failure to remove its property from the plant until the latter part of 1947. The difference between these two amounts, that is, $80,062.09, determines the Government's liability for the year 1948, according to the plaintiff.

The explanation offered by the plaintiff for its failure to realize approximately the same profit ratio following the war that it had experienced during the period 1936 through 1940 is that the Government's delay in removing its machinery and equipment prevented the plaintiff from rearranging its production lines in a manner calculated to achieve economies in production (finding 16). This occurred at a time, continues the plaintiff, which was critical to the electronics industry, a time during which the radio-television industry was expanding rapidly to meet postwar consumer demands. The experience and reputation gained by the plaintiff prior to the war gave every indication of continued success following the termination of hostilities. However, it is argued that the Government's delay in removing its machinery from Plancor 157 destroyed the plaintiff's anticipated profit percentage for the years 1947 and 1948.

This evidence concerning the plaintiff's net sales, adjusted profits, and computed profit ratio for the years referred to, coupled with the testimony of its witnesses seeking generally to establish the connection between the Government's breach and the plaintiff's loss of profits, constitutes the entirety of the plaintiff's case on the issue of lost profits.

Whether this evidence, standing alone, would have been sufficient to establish that the Government's delay in removing its property from Plancor 157 was the proximate and immediate cause of the plaintiff's loss of profits, we need not here decide, inasmuch as certain admissions contained in a letter prepared by the plaintiff's president on June 9, 1947, throw serious doubt upon the validity of plaintiff's claim (finding 20). Because statements found in this document have, in material respects, gone unexplained and were not challenged by the plaintiff through other evidence, we feel that the probability they suggest, i. e., that factors other than the Government's breach were the cause of the plaintiff's loss

of profits, destroys the plaintiff's basic assertion. That letter, looking to an extension of the plaintiff's mortgage payments, informed the defendant, in part, as follows:

"Due to the recession in the Radio and Electrical Applicance fields, we find it imperative to effect substantial reductions in our overhead expenses without delay. *This business is operating at prices approximating 1939 levels, but with labor rates equivalent to twice the prewar level. Materials costs are likewise higher.* However, with the present recession and its effect on value, our cash position has been seriously curtailed. Efforts to maintain employment at a good level must be foregone, if we continue to adversely affect our cash position. We have taken steps to adjust our expenses, and in the case of our payroll, we found it necessary to lay off 67 people, or 20% of the total employees. \* \* \*" (Emphasis supplied.)

Counsel for the plaintiff would weaken the force of the letter by emphasizing the purpose for which it was written. It is argued that the letter sought a concession from the Government; i. e., the reduction of mortgage payments which the Crowley company had agreed to make under the purchase agreement of September 10, 1946. It was thought that a "polite" letter would serve this purpose best. For that reason the plaintiff did not specifically attribute its financial difficulties to the presence of the defendant's machinery and equipment. As a matter of fact, the plaintiff's explanation that the electronics industry was experiencing a postwar boom of major proportions is contrary to the statement contained in the letter.

But this explanation does not go far enough. While we are inclined to take judicial notice of the year 1947 as marking a resurgence of the radio and television industry, rather than a recession, we have no basis for questioning or

disbelieving the underscored portion of the letter relative to low prices and high labor cost. On that point, the plaintiff is silent.

Accepting as true the statements found in the letter concerning the plaintiff's postwar price structure, and the increased costs of labor and materials, the plaintiff's failure to retain its prewar profit ratio is understandable. For to recapture a prior profit ratio—in the face of increased labor and material costs—with a static price level is a sheer impossibility. Moreover, this condition presumably accounts for the plaintiff's failure to realize any profits in 1947. The plaintiff does not suggest that the Government is responsible for the continuation of its 1939 price level into the immediate postwar period. Nor does it blame the Government for the general postwar increase in the cost of labor and materials.

Though the plaintiff does not directly attempt to answer the serious questions raised in this letter, it does contend generally that because of its inability to rearrange its production lines in accordance with postwar production plans it incurred additional costs by reason of the presence of Government machinery and equipment in Plancor 157 beyond the expiration of the 90-day removal period. (Finding 16(a)). To the extent that this condition brought about increased material costs through impairment of the manufacturing process, thereby increasing product rejections,

and might have added to the cost of labor by requiring additional handling of products, then it could be said that the breach by the Government deprived the plaintiff of profits it would otherwise have earned.[1] But the plaintiff did not, and possibly could not, introduce evidence showing that added costs were *not* due to a general, industry-wide increase in wage rates and in cost of raw materials used in its manufacturing process, but rather to the condition created in the plant by the Government. Nor did the plaintiff show that the price level set for its products, was sufficiently high to insure a profit, assuming, as the letter of Mr. Crowley would indicate, the presence of added costs of operation not induced by the Government. We also have no way of knowing whether the situation described in the letter of June 9, 1947, extended through the year 1948. Conceivably it did. For these reasons the plaintiff has failed in its burden of proof.

See Prejean v. Delaware-Louisiana Fur-Trapping Co., Inc., 5 Cir., 1926, 13 F.2d 71, 73; Burks v. Sinclair Refining Co., 3 Cir., 1950, 183 F.2d 239; Western Union Tel. Co. v. R. J. Jones & Sons, 5 Cir., 1954, 211 F.2d 479. The record before us thus leaves the issue of proximate cause in the realm of speculation. Story Parchment Company v. Paterson Parchment Paper Company, 1931, 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544.[2]

1. This argument of the plaintiff suggests that the defendant was responsible for arrangement of the production lines within Plancor 157. However, this is not the case. The original arrangement of the production lines in the plant, including the arrangement whereby ceramics and iron cores were manufactured in adjacent areas of the plant, thereby increasing the incidence of contamination of ceramics due to the presence of iron dust in the air, had been made by the plaintiff (finding 16(b)).

2. In Story Parchment Company v. Paterson Parchment Paper Company, 1931, 282 U.S. 555, at page 562, 51 S.Ct. 248,

250, where the issue was whether the plaintiff sustained a loss of profits as a result of respondents' price-cutting combination, the Court said:
"* * * The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. Taylor v. Bradley, 4 Abb.Ct. App.Dec., N.Y., 363, 366, 367:
" 'It is sometimes said that speculative damages cannot be recovered, because the amount is uncertain; but such remarks will generally be found applicable to such damages as it is uncertain whether sus-

The plaintiff also asserts that its total production for the years 1947 and 1948 would have surpassed its actual production for those years to the extent of products worth $3,009,324.69. On this amount a profit of 13.03 percent, or $392,115.01, would have been realized, argues the plaintiff. Once again, however, the plaintiff's proof is inadequate. The plaintiff estimated, based on the demonstrated wartime productive capacity of Plancor 157, an annual net sales volume of $2,750,000 for the years 1947 and 1948. Whether this estimated capacity would have been met depends, of course, upon the number and scope of orders or contracts placed with the plaintiff. See Chain-Belt Co. v. United States, supra; Guido v. Hudson Transit Lines, 3 Cir., 1950, 178 F.2d 740. However, evidence of this nature was not introduced. We therefore cannot say what the plaintiff's production would have been in 1947 and 1948 if the Government had removed its machinery and equipment from the plant prior to December 9, 1946 (finding 27(c) (2)).[3] Even if it were otherwise, our dissatisfaction with the plaintiffs' proof regarding loss of profits would compel us to reject this basis of recovery.[4]

Finally, the plaintiff urges that the difficulties imposed by the presence of Government-owned machinery and equipment in Plancor 157 beyond the date of December 9, 1946, caused it to lose the favorable position it had enjoyed in the electronics industry prior to World War

tained at all from the breach. Sometimes the claim is rejected as being too remote. This is another mode of saying that it is uncertain whether such damages resulted necessarily and immediately from the breach complained of.

" 'The general rule is, that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain. The latter description embraces, as I think, such only as are not the certain result of the breach, and does not embrace such as are the certain result, but uncertain in amount." * * *

3. While the plaintiff's rearrangement of production lines in Plancor 157 was completed in 1948, followed by an improvement in quality of the plaintiff's products, the record does not show to what extent this rearrangement brought about an improvement of the plaintiff's rate of production, its volume of business or its profits (finding 17(b)).

4. In Chain Belt Co. v. United States, 1953, 115 F.Supp. 701, 127 Ct.Cl. 38, where we allowed the plaintiff lost profits under circumstances quite similar to the instant case, the method of proof is to be distinguished from that employed here. While the plaintiff in Chain Belt offered evidence of a profit ratio of approximately 21 percent for the years 1936 through 1945, its allowed recovery was based upon a showing that its total business earnings during the period of delayed plant clearance operations, i. e., from December 10, 1946 to February 15, 1947, approximated a net profit of $0.0118 per square foot of manufacturing floor space each calendar day. It had been previously established that the nature of the plaintiff's manufacturing operations was such that its earning capacity bore a substantial relationship to its available manufacturing floor space. Also established was the fact that for the year ending October 1946, the plaintiff's backlog of orders for its chain belt and transmission division, the expansion of such division being delayed by the Government's breach, had increased approximately 72 percent to over $6,000,000. Finally it was shown that because of inability to meet delivery schedules for chain belt orders, the plaintiff's new orders were restricted and some cancellations resulted. In view of this evidence, the net profit computation of $0.0118 per square foot a calendar day was applied to the floor area occupied by Government machinery and equipment, less that floor area occupied by the plaintiff in its continued operation of the old chain belt plant, and then multiplied by 67, the number of days (beyond the authorized removal date) consumed by the Government's clearance operations, in arriving at a loss in profits of $91,761.78.

The plaintiff in Chain Belt, unlike the plaintiff here, was therefore able to establish a loss of profits resulting from the Government's breach of contract by the additional showing of *profitable* postwar manufacturing operations, a relationship between earning capacity and available manufacturing floor space, and an accumulation of orders for its products.

II. As a consequence, the plaintiff claims it was damaged to the extent of $2,000,000.

That the plaintiff's position in the industry was less favorable during the years 1946–1948 than it had been prior to World War II is unquestioned. The record generally indicates the emergence of competition to the plaintiff's business following the war. Specifically, experienced employees left the Crowley Company and organized their own companies in competition with the plaintiff. Companies which had not competed with the plaintiff prior to the war began manufacturing operations in the product field of the plaintiff, and companies which had formerly purchased electronics parts from the plaintiff began the manufacture of these parts themselves. The plaintiff attributes these postwar developments to the situation created by the Government's delay in removing its property from Plancor 157. Whether this is an accurate explanation of the Crowley Company's predicament, we cannot say on the basis of the record before us. Many factors, both political and economic, generally contribute to the development of competition within a particular line of industry. Presumably companies other than the plaintiff planned to exploit to the maximum the postwar seller's market. Enterprising individuals who had acquired their skills at the Crowley Company likewise may have been sufficiently encouraged by peacetime economic prospects to organize their own companies in competition with the plaintiff. In other words, these developments may have had their roots in the situation created by the Government in 1946 and 1947; they may have been entirely unaffected by that situation; or they might well have occurred in its absence. Whatever the cause, the plaintiff has not succeeded in establishing that it was due to the Government's delay in vacating the plant (finding 27(d) (2)).

In regard to the defendant's counterclaim it does not appear that the poor condition in which the Government's machinery and equipment were found following their removal from Plancor 157 was due to failure upon the part of the plaintiff to exercise reasonable care in their use. This condition was probably a consequence of the type of use to which the machinery and equipment were put in order to meet the Government's wartime production requirements. Additionally, the evidence is insufficient to show the reasonable value of those items of machinery and equipment used by the plaintiff after September 10, 1946, but not thereafter purchased by it (findings 29 and 30).

For the above reasons, the plaintiff's petition and the defendant's counterclaim will be dismissed.

It is so ordered.

REED, Justice (retired), JONES, Chief Judge, and MADDEN, Judge, concur.

WHITAKER, Judge, took no part in the consideration and decision of this case.