Barksdale, District Judge,
sitting by assignment, delivered the opinion of the court:
Plaintiff, Concetta Frances Stamer, a citizen and resident of Massachusetts, has instituted this action seeking to recover of defendant, the United States, the death gratuity and arrears of pay and allowances of a deceased soldier, Francis Harold Stamer, aggregating, together with a refund of Government insurance deductions later determined to be due, the sum of $10,206.82, upon her allegation that she was the lawful widow of the deceased soldier at the time of his death. The defendant, the United States, having paid the sum of $10,206.82 to George F. Stamer and Catherine Stamer, parents of the deceased soldier, prior to the institution of this action, denies any liability to plaintiff, but asserts that, if this court should hold it liable to plaintiff, it should have judgment against George F. and Catherine Stamer, third-party defendants, to whom it has made payments of the sums here in suit.
*485 Formal findings of fact appear later herein, but in order to. make our discussion intelligible, the facts may be somewhat, briefly stated as follows:
The deceased soldier, Francis Harold Stamer, was born, in New York, and, when twenty-four years of age, enlisted, there in the regular United States Army on May 3, 1939.. He was then unmarried and gave as his address the New York home of his parents. With the exception of occasional5 brief periods between enlistments, Stamer continued to serve* in the regular United States Army until his death. During a brief period between enlistments, on April 11,1946, Stamer-married in California one Dorothy Mohr, who resided at 14630 Chatsworth Drive, San Fernando, California. On June 29,1946, Stamer reenlisted in the regular army, giving-his wife’s Chatsworth Drive residence as his address in hisi enlistment papers and named her as his beneficiary. However, he named his mother as his nearest relative and the-person to be notified in case of emergency. After this enlistment, plaintiff never again lived with Ms wife, but continued to name her in Ms enlistment papers, and gave her address^ as his own until his second marriage on December 29, 1949.
On December 22, 1949, Stamer, who had been serving in* the regular Army at Fort Devens, Mass., reenlisted for an>. indefinite period, again giving Ms wife’s address in California as his own. Several months prior to this reenlistment,,. Stamer had made the acquaintance of plaintiff, a native and" life-long resident of Massachusetts, then living at Arlington, Mass. At that time, Stamer was thirty-four years old! and plaintiff was thirty-one. She had been previously married, had one child, a daughter Elaine, and had been divorced" since 1942. The court had awarded her the custody of' Elaine with visitation rights to the cMld’s father. Stamer-fell in love with plaintiff, they decided to be married and', entered into what purported to be a marriage, with due legal ceremony, in New HampsMre, on December 29, 1949. As.*, appears from the marriage certificate, Stamer at that time-gave Ms address as Ayer, Mass., the nearest town to Fort Devens, where he was serving. Stamer did not tell plaintiff" that he was already married, and in fact, she was completely - without knowledge of Stamer’s former marriage, and en~ *486 tered into the marriage in good faith. The night after the marriage ceremony, Stamer telephoned his mother and sister in New York, telling them of his marriage to plaintiff, which caused them concern, since they knew, as he did, of the existence of his previous marriage. As a result of this conversation, plaintiff learned of Stamer’s previous marriage. However, she continued to live with Stamer as his wife, first at a trailer court, and then in an apartment at Ayer, Mass., until his departure under orders for service in Korea on August 2,1950.
In February 1950, Stamer’s mother and sister came to Boston for a visit to Stamer and plaintiff, and during the visit there were discussions among the four 'as to his domestic situation. In April, Stamer and plaintiff visited his parents in New York and again discussed the marital situation. As a result of these discussions, Stamer’s parents made a loan to their son and plaintiff of $250.00 (since repaid) to cover the cost of procuring a divorce or annulment from plaintiff’s first wife, Dorothy Mohr. Stamer engaged a Boston lawyer, who referred the matter to a California lawyer, his activities resulting in the entry of a decree of annulment of the first marriage in a California court on August 21, 1950, on the ground of fraud on the part of Stamer. The decree, in part, is as follows:
It is hereby ordered, adjudged and decreed that the marriage between plaintiff and defendant is annulled, and is of no force and effect whatsoever; and further that plaintiff, Dorothy Stamer, has restored to her, her maiden name of Dorothy Mohr.
Prior to Stamer’s departure for duty in Korea, arrangements had been made for plaintiff to close their home in Ayer, Mass., and go to New York to live with his parents during his absence. Within a week after Stamer’s departure, plaintiff did go to live with his parents in New York, taking most of her household effects with her. She returned to Ayer later in the month of August, to secure the consent of her first husband, or a court order, permitting her to take her daughter, Elaine, to New York with her, to pick up other personal effects, and to have all the trunks, kitchen material, linen, knives, forks, etc., taken to the home of her mother in *487 Arlington, Mass. She returned to New York about August 27,1950, with Elaine, lived with Stamer’s family there until school started in September, when she moved into rented rooms at her own expense, convenient to Elaine’s school. Stamer was reported missing in action on November 2,1950, and within several weeks thereafter she returned with Elaine to live with her mother in Arlington, Mass., where she has continued to live until the present time.
On July 31, 1950, Stamer procured National Service Life Insurance in the sum of $10,000.00, naming plaintiff as beneficiary, and gave as his address his parents’ home in New York. This, of course, was only two days before his departure for duty in Korea. After his departure, Stamer, on August 31, 1950, authorized a Class E allotment to plaintiff in the amount of $200.00, raised in September to $240.00, per month, giving his parents’ New York address as plaintiff’s address. Of course, he knew that arrangements had been made for plaintiff to live with his parents in New York during his absence.
Stamer wrote plaintiff a number of letters after his departure, the last letter being dated October 29, 1950, some three or four days before he was reported missing in action. These letters are most affectionate, and indicate clearly his intention to return to plaintiff, to continue to live with her as his wife, and to make a home for her daughter Elaine, of whom he always spoke most affectionately. In his letter of August 25, 1950, from Pusan, Korea, he expressed pleasure that she had been working around the house, meaning the house in Ayer, Mass., and regret that he had not been financially able to buy it. He also expressed the hope that they might have her daughter Elaine permanently with them. In no letter is there the slightest indication that he contemplated their living with his parents or abandoning Massachusetts as their home. After learning that Stamer had been reported missing in action in Korea on November 2, 1950, by letter dated December 12, 1950, plaintiff notified the Department of the Army that she was moving her residence from New York back to Massachusetts, and in fact had already returned to her mother’s home in Massachusetts.
On April 17,1951, plaintiff, through her attorney, asserted *488 to the Army her contention that she was the lawful wife of Stamer. The Department of the Army, on May 9, 1951, requested her to obtain a declaratory judgment to establish her marital rights, which she did not do. However, through her attorney and Representative in Congress, she repeatedly notified the Army of her claim to be the widow of Stamer. On May 23, 1951, Stamer’s parents, through their attorney, notified the Army of their claim to all moneys due the soldier. On December 31, 1953, pursuant to the authority of Public Law 490, 77th Congress, the Adjutant General of the Army made a “Finding of Death of Missing Person”, reciting that infantry Master Sergeant Francis H. Stamer was dead, and further that “He was officially reported as missing in action as of the 2nd day of November, 1950. For the purposes stated in said Act, death is presumed to have occurred on the 31st day of December, 1953”.
After Stamer’s parents had advised the Army that plaintiff was not the legal wife of their son, Sergeant Stamer, pursuant to their formal claims for the gratuity and all arrears of pay and allowances accruing to the deceased soldier, notwithstanding full knowledge that plaintiff was claiming these amounts as the lawful widow of Sergeant Stamer, the Army on October 4, 1954, paid to decedent’s parents the death gratuity in the sum of $1,694.40, on November 3,1954, paid the arrears of pay and allowances to decedent’s parents in the sum of $8,227.52, and on August 13, 1956, paid to decedent’s parents the sum of $284.90 as a refund of Government insurance deductions, the aggregate of these amounts being $10,206.82. Although plaintiff was appointed as Ad-ministratrix of the Estate of Francis Harold Stamer, who died intestate, by a probate court of Massachusetts on July 11, 1956, she had not so qualified on the dates of these payments. Plaintiff is currently, and has been, receiving a pension as the unremarried widow of Francis Harold Stamer from the Veterans’ Administration.
We find as a fact that the domicile of origin of Francis Harold Stamer was the State of New York, that he abandoned the domicile of his origin and became domiciled in California at the time of his marriage to Dorothy Mohr in April 1946, that he abandoned his California domicile at the *489 time of bis marriage to plaintiff, December 29, 1949, changing his domicile to the Commonwealth of Massachusetts, and continued to be domiciled in, and constructively to live with plaintiff as man and wife in Massachusetts until the date of his death, which by lawful authority was found to be December 31, 1953. Plaintiff, at all times here pertinent, has been domiciled in Massachusetts.
Our findings of fact are in accord with the reported findings of fact of Commissioner Day in all respects save one. The Commissioner found “that Francis Harold Stamer was domiciled at 14630 Chatsworth Drive, San Fernando, California, at the time of his death.” With this we cannot agree. Plaintiff excepted to this finding and requested a finding that Stamer was domiciled in Massachusetts at the time of his death, or at least as of August 21,1950. We do not question the finding of the Commissioner insofar as it finds that Stamer abandoned his domicile of origin, New York, and became domiciled in California at the time of his first marriage in 1946, but we are of opinion that he changed his domicile at the time of his second marriage in December 1949. Although Stamer only lived with his first wife a short time, he continued to give her California home address as his own and name his first wife in his enlistment papers until December, 1949. However, when Stamer and plaintiff were married on December 29, 1949, he was then living in Massachusetts, being quartered on the army post at Fort Devens. In the marriage certificate, he gave Ayer, Massachusetts, as his residence, and promptly set up housekeeping with plaintiff there in rented quarters near, but off, the army post. Stamer and plaintiff continued to live together in Ayer, Mass., until his departure for service in Korea, they having moved to a more permanent home some six weeks after their marriage. Plaintiff was a lifelong resident of Massachusetts, her mother and child lived there, and she obviously had no desire or intention of leaving that state. It is true that, immediately prior to his departure and thereafter, plaintiff gave the New York address of his parents as his own address and that of plaintiff, but there is no question of the fact that the arrangement for plaintiff and her daughter to live with Stamer’s parents, was purely a temporary *490 arrangement, to continue only during Stamer’s Korean service. All the evidence, particularly Stamer’s letters to plaintiff, indicate his definite intention to make a permanent home for himself, plaintiff and her daughter, in Massachusetts. After Stamer’s marriage to plaintiff, there are no circumstances whatever to indicate an intention on his part to retain a California domicile. He had long since ceased to live with his first wife, and the continuation of his marriage to her up until that time, was purely technical.
District of Columbia v. Murphy, 314 U.S. 441, is interesting in this connection. The Supreme Court had under consideration the domicile of public servants, prior residents elsewhere, who resided in the District of Columbia. The court held that—
_ A man does not acquire a domicile in the District simply by coming here to live for an indefinite period of time while in the Government service,
so long as such a person has the intention of returning to his previous domicile. But the court further said, p. 454:
On the other hand, we hold that persons are domiciled here who live here and have no fixed and definite intent to return and make their homes where they were formerly domiciled.
As stated in Restatement of the Law, Conflict of Laws, p. 32:
The requisites for acquiring a domicile of choice are:
“(1) Absence of intention to have a home * * * at a former domicile;
“ (21 Presence in a new dwelling place;
“(3) Intention to make this new dwelling place a home.”
We hold that these requisites were present as to Stamer on December 29, 1949, and there was no change of domicile on his part thereafter.
It is true that a soldier ordinarily does not acquire a domicile of choice by living in assigned quarters on a military post in a state other than his domicile of origin, for he must obey orders and cannot choose to go elsewhere.
If, however, he is allowed to live with his family where he pleases, provided it is near enough to his post *491 to enable Mm to perform his duty, he can acquire a domicile where he lives. Illustrations: * * * (3) A’s domicile is X. A is an army officer stationed at Y. He is permitted to live outside the army post. A marries a resident of Y, purchases a house in Y, and lives there with his family with intention of making it his home. A acquires a domicile of choice in Y. (Restatement of the Law, Conflict of Laws, 41,42.)
This illustration is most analogous to Stamer’s situation* the only substantial difference being that he did not “purchase a house”, but established a home for himself and plaintiff in rented quarters.
See also 17A, Am. Jur. 228:
There is some difficulty, of course, in establishing a, domicile of choice on the part of a serviceman where the place in which he lived was one at which his obligations as a serviceman compelled him to live. In a few cases it has been held that legal residence or domicile,, in a state could not be acquired by residence on a military reservation under United States jurisdiction although such reservation is situated within the borders of a state. On the other hand, if a person engaged in military service by animus and factum establishes a residence outside the military post, with the purpose of making such residence the home of himself and his wife, he may acquire a domicile in such place.
See also St. John v. St. John, 291 Ky. 363, 163 S.W. 2d 820, Allen v. Allen, 52 N.M. 174, 194 P. 2d 270; Wallace v. Wallace, 371 P. 404, 89 A. 2d 769.
Plaintiff contends that she is the legal widow of Stainer* the deceased soldier, on two alternative grounds: first, she contends that the annulment of Stamer’s first marriage in California related back to the date of the marriage so as to have eliminated any impediment standing in the’ way of Ms marrying plaintiff, although the decree of annulment was not entered until after the date of the second marriage; and second, that a Massachusetts curative statute (Massachusetts General Law, Ch. 207, Section 6) operated to validate plaintiff’s second marriage on August 21, 1950; the date of the annulment decree. The statute relied on is as follows:
Marriage During Existence of Former Marriage Valid* When. — If a person, during the lifetime of a husband or wife with whom tire marriage is in force, enters into a *492 subsequent marriage contract with, due legal ceremony, and1 the parties thereto live together as husband and wife, and such subsequent marriage contract was entered into by one of the parties in good faith, in the full belief that the former husband or wife was dead, that the former marriage had been annulled by a divorce, or without knowledge of such former marriage, they shall, .after the impediment to their marriage had been removed by death or divorce of the other party to the former marriage, if they continue to live together as husband and wife in good faith on the part of one of them, be held to have been legally married from and after the removal of such impediment, and the issue of such subsequent marriage shall be considered as the legitimate issue of both parents.
Taking up these contentions in inverse order, it is obvious that, applying this statute to the facts found, most of the requisites of the statute have been complied with. Stamer •and the plaintiff, during the lifetime of his first wife with whom his marriage was still in force, entered into a subsequent marriage contract with due legal ceremony, and lived together as husband and wife. This subsequent marriage ■contract was entered into by one of the parties, the plaintiff, :in good faith, without knowledge of such former marriage, .and the impediment to their marriage was removed by the ■California annulment decree of August 21, 1950. There remains only the question of whether, after the removal of ■this impediment, Stamer and plaintiff continued to live together as husband and wife in good faith on the part of one •of them, in order that they be held to have been legally married from and after the removal of the impediment. 'There is no question of the good faith of plaintiff, but it is ■trae that plaintiff and Stamer did not physically live together after August 21, 1950, the date of the annulment ■decree, because Stamer left for service in Korea on August :2,1950, and never returned.
Stamer did not leave plaintiff on August 2, 1950, voluntarily: on that date and prior thereto they were living together amicably and happily, and Stamer left plaintiff solely by reason of the compulsion of the military order requiring him so to do. Stamer’s letters, after his departure, clearly show that he loved the plaintiff dearly, held her in the *493 highest esteem, and that he was most anxious to return and make a permanent home for her and her daughter. Under these circumstances, we hold the Massachusetts law to be that Stamer and the plaintiff constructively continued to live together until the time of his death, presumptively on December 81, 1953.
In Carr v. Hobby, Secretary &c., 125 F. Sup. 545, the Massachusetts District Court, in construing the statute hereunder consideration, held that to equate living together with cohabitation, was too narrow an interpretation to place on the statute, and further indicated that, under Massachusetts law,
a husband and wife might be found to be living together within the meaning of Section 6 (the statute here under consideration) even though at the time that the impediment was removed, they were separated because of illness, difficulty in finding living quarters or financial difficulties.
In Lopes Case, 332 Mass. 39, 123 N.E. 2d 217, the court held that, although the husband left his wife at their home in Massachusetts and went to the Cape Verde Islands, seeking to regain his health, was away for a year prior to the death of his wife, but remained on amicable terms and corresponded with her, that at his wife’s death she was a “wife with whom he lives” at the time of her death. See also Harrrington's Case, 297 Mass. 125, 7 N.E. (2) 732, and Gilson's Case, 254 Mass. 460, 150 N.E. 183, which are in accord.
In Moss v. Tanner (5th Circ.), 44 F. (2d) 928, in construing a provision of the Longshoreman’s Act, the court said (p. 930) :
This provision does not indicate a purpose to make a physical dwelling together of a decedent and his wife at the time of the former’s death necessary to bring them within the meaning of the words “living together”' when at that time there had been no estrangement between them and no intention on the part of either of them to sever, even temporarily, their marital relations. A husband and wife do not cease to “live together”' within the meaning ordinarily conveyed by those words when used with reference to married persons, as a result of one of them being temporarily absent from their home-while engaged in work which was undertaken with the. *494 purpose of acquiring money for use in paying for or maintaining their home.
The fact that plaintiff and Stamer were married in New Hampshire, is not important, because the Massachusetts ■courts have uniformly held that the curative statute operates equally to cure defects in marriages contracted outside ■of Massachusetts as well as those contracted within the state Royal v. Royal, 324 Mass. 613, 87 N.E. (2) 850, Carmichael v. Carmichael, 324 Mass. 118, 85 N.E. (2) 229, Vital v. Vital, 319 Mass. 185, 65 N.E. (2) 205.
Coming now to plaintiff’s initial contention that her marriage to Stamer on December 29, 1949, was valid, for the reason that the California court’s decree of August 21, 1950, adjudicating that the marriage between Stamer and his first wife “is annulled and is of no force and effect whatsoever,” caused the status of the parties to be the same as if that marriage had never taken place, and therefore removes the impediment existing on December 29, 1949, it seems that the California authorities support her contention. This question was carefully considered and the authorities reviewed ■by a California District Court in the case of Pearsall v. Folsom, Secretary &c., 138 F. Sup. 930. There, the Plaintiff was awarded “mother’s insurance” under the Social Security Act as the unremarried widow of a wage earner. Later, she ■entered into a second marriage and her Social Security benefits were terminated. Thereafter, finding that the second marriage was voidable for fraud on the part of the second husband, a California court decreed annulment. Her application that her payments be renewed being denied, she instituted action against Folsom, Secretary, and the court held that her second marriage having been annulled, the defendant must consider her as never having been remarried. The opinion refers to McDonald v. McDonald, 6 Cal. (2) 457, 58 P. (2) 163, 104 A.L.R. 1290, as the leading case dealing with •annulment and voidable marriages. There the California rule is stated as follows:
Appellant’s argument overlooks the nature of an annulment proceeding. A marriage cannot be annulled unless there was something legally wrong with it in its inception. Under the very language of section 82 of the Civil Code, an annulment is granted for causes “existing *495 at the time of tbe marriage.” A marriage valid in all respects when contracted can never be annulled. The meaning of the phrase “good until annulled”, used in the above cases, is simply that in the case of voidable marriages (as distinguished from void marriages) a right of action to dissolve it for some cause existing at the time the marriage was contracted has no effect on the relationship until such right is exercised. A familiar analogy exists in the law of contracts. Thus a contract may be voidable and subject to rescission, because of some infirmity in its procurement, but, unless attacked by notice of rescission or by suit, will not be avoided, but will remain binding. Garcia v. California Truck Co., 183 Cal. 767, 192 P. 708. So with voidable marriages. The parties may or may not exercise their legal right to have them annulled, and, if they do not exercise such right, the marriages are binding, but, when annulment is sought, it can be granted only if there was some element of invalidity in the contracting of the marriage. Thus, in Millar v. Millar, 175 Cal. 797, 806, 167 P. 394, 398, L.R.A. 1918B 415, Ann. Cas. 1918E, 184, it is stated: “Strictly speaking the word ‘divorce’ means a dissolution of the bonds of matrimony, based upon the theory of a valid marriage, for some cause arising after the marriage, while an annulment proceeding is maintained upon the theory that, for some cause existing at the time of marriage, no valid marriage ever existed. This is true even though the marriage be only voidable at the instance of the injured party, or in the words used in Estate of Gregorson, 160 Cal. (21) 25, 116 P. 60, L.R.A. 1916C, 697, Ann. Cas. 1912D, 1124, ‘capable of being annulled’. And the decree of nullity in such a proceeding determines that no valid marriage ever existed.” See also Goodrich, Conflict of Laws, p. 302. [Italics supplied.]
See also In re Eichhoff, 101 Cal. 600, 36 P. 11, Biles v. Biles, — Cal. —, 236 P. (2) 621.
In the case of Sefton v. Sefton, 45 Cal. (2) 872, 291 P. (2) 439, the California court recognized an exception to the “relation back” doctrine. However, the factual situation there had no analogy to the facts of this case.
We therefore hold that the decree of annulment entered by the California court related back to the inception of Stamer’s first marriage, rendering it void from its inception, thus removing any impediment to the validity of the marriage of Stamer and plaintiff.
*496 As to the Government’s defense and contingent claim, it appears that on October 4, 1954, and thereafter, defendant,, the United States, pursuant to the formal claim of George F. Stamer and Catherine Stamer, parents of the deceased soldier, paid to them all the sums due on account of decedent’s death and which are here in controversy. Although she had not, on October 4, 1954, been appointed as admin-istratrix of the estate of the deceased soldier, plaintiff, through her attorney, had given notice to the Army of her claim to be his widow and entitled to such stuns as might be due her as such. Defendant contends that no matter what plaintiff’s rights may be, as to George F. and Catherine Stamer, the defendant has no liability to her, its payments to the parents being justified by 10 U.S.C. 868, the pertinent part of which is as follows:
Hereafter in the settlement of the accounts of deceased officers or enlisted persons of the Army, where no demand is presented by a duly appointed legal representative of the estate, the accounting officers may allow the amount found due to the decedent’s widow, widower, or legal heirs in the following order of precedence: First to the widow or widower, or if the widow or widower be dead at the time of settlement, then to the children or their issue, per stirpes, third, if no widow, widower, or descendants, then to the father and mother in equal shares; * * *
No legal representative of the deceased soldier having been appointed, if plaintiff was the widow of the deceased soldier, she was plainly entitled to the payments which the defendant made to the parents of the deceased. As plaintiff had not procured a declaratory judgment declaring her to be the legal widow of the deceased soldier, as requested by defendant, defendant chose not to wait for the plaintiff or ■¡deceased parents to institute action against it and be put to their proof as to who was entitled to the money, but proceeded in effect to make a judicial determination that plaintiff was not the legal widow of the deceased soldier and make the payments to his parents. We hold that the defendant made these payments at its peril, and since we have concluded that plaintiff was decedent’s widow and entitled to these payments, she is entitled to a judgment against the *497 defendant for the aggregate amount erroneously paid to the soldier’s parents.
This is in accord with the recent holding of this court in Howell v. United States, and Belew, Third Party Defendant, 141 C. Cls. 699. There, the situation was quite analogous. The stepmother of a deceased soldier, who had raised him from a child, made claim on the Air Force for his accrued pay and allowances, to which she had. been made beneficiary by the soldier’s will. At the time she made her claim, the will had not been probated, as the soldier was still being carried in a “missing” status, but the Air Force was supplied with a copy. After the presumptive death of the soldier, the stepmother probated the will and was appointed executrix of the soldier’s estate. However, she then found that the Government had already made payment to the soldier’s natural mother pursuant to her claim, relying upon 10 U.S.C. 868, supra. This court held that the defendant’s payment to the natural mother did not discharge defendant’s obligation to make payment to the specifically designated beneficiary in accordance with the express wishes of the deceased, especially since the defendant had full knowledge of the terms of the will at the time of the erroneous payment.
It is distressing that this controversy between the widow and the parents of the deceased soldier has arisen. Master Sergeant Stamer was a gallant soldier who gave his life for his country. It is apparent from the record that a close and affectionate relationship existed between the son, his parents, his sister and brother. It is equally apparent that he loved his wife dearly. It is too bad that their inevitable sadness over his death should be aggravated by this controversy. However, as the controversy exists, we must resolve it.
We hold that the plaintiff is entitled to recover of and from the United States the sum of $10,206.82, and since this sum has been erroneously paid to third party defendants, George and Catherine Stamer, by the defendant, the United States, it is entitled to recover that amount from them. Judgments will be entered accordingly.
It is so ordered.
MaddeN, Judge, and JoNes, Chief Judge, concur.