William P. LOFTIN, Sr. d/b/a
Loftin Dairy

v.

The UNITED STATES.

No. 710–83C.

United States Claims Court.

Nov. 19, 1984.

Henry P. Doggrell, Memphis, Tenn., for plaintiff. John S. Porter, June F. Entman and Burch, Porter & Johnson, Memphis, Tenn., of counsel.

Michael A. Gordon, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant. Michael Werner, Dept. of Agriculture, Washington, D.C., of counsel.

## OPINION

LYDON, Judge:

In this case, plaintiff challenges the validity of the amount of indemnification he received after the destruction of his dairy cattle, some of which were infected with tuberculosis caused by *Mycobaterium bovis*. Pursuant to 21 U.S.C. § 114a (1982) the United States Department of Agriculture in requisite coordination with the State of Mississippi inspected plaintiff's herd and discovered tuberculosis. A subsequent agreement was signed by the plaintiff agreeing to complete herd depopulation. After plaintiff's cattle were destroyed, defendant indemnified plaintiff in an amount consistent with the compensation set out in the regulations promulgated pursuant to 21 U.S.C. § 114a. *See* 9 C.F.R. § 50.3 (1983).[1]

Plaintiff claims that the indemnification he received was insufficient and that he is entitled to the fair market value of the cattle minus their salvage value as mandated by 21 U.S.C. § 134a (1982). Plaintiff actually received far less than fair market value under the regulations promulgated under 21 U.S.C. § 114a. *See* 9 C.F.R. § 50.3 (1983). Plaintiff also claims that he is entitled to additional reimbursement for transportation expenses incurred in shipping his cattle to slaughter and additional

---

1. It should be noted that defendant was acting pursuant to the 1983 regulations, but 9 C.F.R. Part 50 did not change in 1984.

compensation for losses incurred at the slaughterhouse and for lost profits.

The court has before it plaintiff's motion for partial summary judgment on the issue of the proper compensation for his destroyed cattle. There is also before the court a motion for summary judgment by defendant on the same issue of indemnification. Plaintiff asserts: (1) 21 U.S.C. § 134a and 21 U.S.C. § 114a mandate the use of fair market value thereby making the regulations applied in this case invalid, or (2) defendant actually destroyed the cattle under the guise of section 134a and thus the proper measure of compensation is fair market value as prescribed in said section. Defendant, on the other hand, asserts that the indemnification and other sums already paid to plaintiff is all that he is entitled to receive.

After consideration of the undisputed material facts in the case, the applicable statutes and regulations, the case law in this area and the oral argument of both parties, the court concludes that plaintiff's motion for partial summary judgment should be denied and that defendant's motion for summary judgment should be granted.

## I.

### FACTS

William P. Loftin (W.P. Loftin) owns and operates a business known as Loftin Dairy (plaintiff) in the State of Mississippi. During 1983, Loftin Dairy maintained a herd of approximately 1,000 dairy cattle on his facilities in Red Banks, Mississippi, and in Benton County, Mississippi. Included in this herd were approximately 200 to 250 head of cattle leased from Consolidated Enterprises, Inc., which was located in Memphis, Tennessee.

2. The disposition of the cattle leased from Consolidated Enterprises, Inc., was accomplished through separate agreements with that corporation and the government. On March 16, 1983, Consolidated Enterprises, Inc. agreed to the depopulation of its cattle pursuant to *Cooperative Control and Eradication of Livestock and Poul-*

On January 14, 1983, a slaughter sample from a regular kill animal was collected at Pioneer Beef Company, Greneda, Mississippi. The sample was confirmed as bovine tuberculosis (*Mycobaterium bovis (M. bovis)*) on February 28, 1983, by the National Veterinary Services Laboratories, Ames, Iowa. The tuberculosis affected animal was traced to the Loftin Dairy in Red Banks, Mississippi, owned by the plaintiff. On or about January 28, 1983, Dr. Daniel Thomas, a United States Department of Agriculture (USDA) veterinarian, informed plaintiff that a cow from his farm was suspected of having tuberculosis. Plaintiff confirmed that he had sold the cow at the South Memphis Stockyard in Tennessee to Pioneer Meat Packing Company on January 13, 1983.

At the time of the initial discovery as set forth above, the Loftin Dairy herd was composed of 790 cattle owned by plaintiff and 113 leased cattle.[2] On January 31, 1983, and February 3, 1983, the milking cattle were tested by Dr. Thornal D. O'Quinn and Dr. Thomas of the USDA and by officials of the State of Mississippi and found to contain tuberculosis.[3] On February 8, 1983, Dr. O'Quinn, acting pursuant to Mississippi animal health statutes, quarantined the Loftin Dairy herd because of tuberculosis. The remaining 118 pastured cattle were tested on February 14, 1983, and February 17, 1983, by Dr. O'Quinn and some were found to have tuberculosis.

The test disclosed 35 cattle as tuberculosis reactors—affected with tuberculosis. *See Cooperative Control and Eradication of Livestock or Poultry Diseases, Part 50 —Cattle Destroyed Because of Tuberculosis,* 9 C.F.R. § 50.4(a) (1983). Twenty-seven of these cattle were owned by Loftin Dairy and 8 were leased. By agreement between plaintiff and the USDA the 27 cattle owned by plaintiff were appraised on

*try Diseases, Cattle Destroyed Because of Tuberculosis,* 9 C.F.R. Part 50 (1983).

3. Loftin Dairy, prior to the testing, had divided its herd between two premises. One area contained 785 milking cattle and the other contained 118 pastured cattle.

February 16, 1983, and slaughtered on February 17, 1983, at Bryon Brothers Packing Company, West Point, Mississippi. The tests performed on these cattle disclosed extensive tuberculosis. Therefore, they were classified as "affected" cattle for the purposes of indemnity payment. *See* 9 C.F.R. § 50.3. Indemnity for these 27 affected cattle was approved on May 11, 1983, in the amount of $20,250.00.[4]

On March 9, 1983, the USDA authorized an offer of indemnity for the depopulation of the tuberculosis exposed cattle. The plaintiff and the leasing company were given two options: (1) slaughter the entire herd of cattle and be indemnified for the proper number of affected or exposed cattle, or (2) remove and slaughter only the reactor or affected cattle and quarantine the remaining exposed cattle for at least 10 months.[5] Plaintiff agreed to the complete depopulation of his herd on March 9, 1983, in exchange for "indemnity for each animal so destroyed *in accordance with the regulations* [9 C.F.R. § 50.3] * * *." The agreement also provided for the subsequent cleaning and disinfection of the premises under official supervision pursuant to the regulations. *See* 9 C.F.R. § 50.13.

Plaintiff's affidavits and the argument of plaintiff's counsel imply that plaintiff was ignorant of the contents of the pertinent regulations at the time he signed the depopulation agreement and at all other relevant times. However, prior to the date he signed the depopulation agreement plaintiff had signed an "Appraisal and Indemnity Claim" form for his initial twenty-seven cattle destroyed on February 17, 1983. The amount due from the United States was listed on the form as $20,250. This figure equals 27 multiplied by $750. As indicated earlier, $750 is the maximum indemnity amount for affected cattle. Therefore, when plaintiff signed this form on February 16, 1983, he was aware that his indemnification rate was not the fair market value of the cattle but was the rate established by the regulations.

In all, 790 head of cattle owned by the plaintiff were destroyed. Post-mortem examinations were performed to determine the exact number of affected and exposed cattle for indemnity purposes. The total indemnity received by plaintiff was $420,-382.69. Plaintiff received $202,788.34 in salvage value for the 790 cattle destroyed. The total appraised fair market value of the 790 cattle at that time was $867,263. Plaintiff, therefore, recovered $244,091.97 less than the fair market value of his cattle. Plaintiff asserts that he is entitled to this additional amount.

In addition to plaintiff's claim for the balance of the fair market value of his herd, he also claims that he is entitled to additional indemnification for his transportation expenses. Plaintiff was required to ship his cattle to a slaughterhouse for disposal. Plaintiff was reimbursed for ½ the cost of transporting 195 affected cows. It received no reimbursement for the transportation of the exposed cattle. *See* 9 C.F.R. § 50.8. Associated with this claim is a claim for damages arising from plaintiff's assertion that government officials required him to use a slaughterhouse which paid less in salvage value than the facility plaintiff desired to use.

Finally, plaintiff claims that he is entitled to damages for lost profits suffered during the period in which he had no cattle and was forced to meet contractual obligations

**4.** 9 C.F.R. § 50.3 provides a maximum of $750 indemnity for affected cattle with the limitation that "any joint State-Federal indemnity payments, plus salvage, must not exceed the appraised value of each animal." Plaintiff, in this case, received the maximum provided by the regulations.

**5.** Because of the extensive infection discovered in the first 35 animals slaughtered, the USDA decided to classify all 278 of the cattle, which had positive responses to the initial testing, as reactor or affected cattle. Plaintiff's counsel during oral argument claimed that, considering the economics of the situation, plaintiff essentially was presented with no choice. However, it is clear that if plaintiff was disturbed by any of the proposed governmental acts he did have legal recourse. *See Barton v. United States Department of Agriculture*, 523 F.Supp. 1019 (S.D. Ill.1981).

by purchasing milk from other producers. Associated with the claim for lost profits is a claim for damages resulting from plaintiff's inability to use equipment utilized in the production of milk. This inability to use the equipment was necessary to allow the premises to be cleaned and disinfected as provided in the depopulation agreement. *See also* 9 C.F.R. § 50.13. Plaintiff received a release from all quarantine restrictions on September 2, 1983.

## II.

### Discussion

#### A.

The primary issue presented to the court on the motions for summary judgment centers on the correct method of valuing plaintiff's cattle in order to properly indemnify plaintiff for the destruction of his cattle. Plaintiff maintains that he should be indemnified for the full fair market value minus what he received for salvage value. The government, on the other hand, asserts that it was operating under 21 U.S.C. § 114a (1982) and the regulations promulgated thereunder (9 C.F.R. Part 50 (1983)). Pursuant to the regulations defendant contends that the $420,382.69 already paid to the plaintiff is all that he is entitled to recover from the Federal government.

■ Plaintiff initially argues that under both 21 U.S.C. § 114a and 21 U.S.C.A. § 134a(d) he is entitled to indemnity for the full fair market value of his cattle less salvage value received. Plaintiff concludes that if both sections mandate the use of fair market value, or if section 134a replaced section 114a, then any regulations calling for less than fair market value are inconsistent with the statute and are therefore invalid. The court disagrees with this position and finds that two distinct methods of indemnification exist under the above sections.

Section 114a provides in pertinent part:

The Secretary of Agriculture, either independently or in cooperation with States or political subdivisions thereof, farmers' associations and similar organizations, and individuals, is authorized to control and eradicate any communicable diseases of livestock or poultry * * * which in the opinion of the Secretary constitute an emergency and threaten the livestock industry of the country, *including payment of claims growing out of destruction of animals* (including poultry), and of materials, affected by or exposed to any such disease, *in accordance with such regulations as the Secretary may prescribe.* [Emphasis added.]

Sometime after the initial passage of this statute in 1884, the Secretary of Agriculture promulgated the regulations under which he would operate. In 1962, the year section 134a was adopted, these regulations provided for an indemnification of one-third of the difference between the fair market value of the animal and its salvage value with the provision that for any grade animal the indemnification figure was not to exceed $25 and for purebred animals the limit was $50. *Cooperative Control and Eradication of Animal Products—Cattle Destroyed Because of Brucellosis (Bang's Disease), Tuberculosis, or Paratuberculosis,* 9 C.F.R. 51.2 (1959).

Section 134a(d) on the other hand specifically provides for indemnification based on fair market value of the animal. Section 134a(d) states:

Except as provided in subsection (e) of this section, the Secretary shall compensate the owner of any animal, carcass, product, or article destroyed pursuant to the provisions of this section. Such compensation shall be based upon the fair market value as determined by the Secretary, of any such animal, carcass, product, or article at the time of the destruction thereof. Compensation paid any owner under this subsection shall not exceed the difference between any compensation received by such owner from a State or other source and such fair market value of the animal, carcass, product, or article. * * *

It is obvious in reviewing the legislative history of section 134a that Congress did

not intend to replace section 114a. Section 134a was designed to fill specific gaps in section 114a. However, section 134a did not address the measure of indemnification under situations in which the Secretary of Agriculture was acting under section 114a. Presumably, Congress had section 114a and its regulations regarding indemnification in front of it when it passed section 134a, but it left the indemnity provisions of 9 C.F.R. § 51.2 (1959) unchanged.

Greater scrutiny of sections 114a and 134a and the legislative history of S. 860 (Senate Bill incorporating section 134a) demonstrates how the two sections were intended to operate. S. 860 was "designed to close a number of gaps which [had] shown up in the animal quarantine laws and to clarify authority for certain actions under such laws." *S.Rep.* No. 582, 87th Cong. 1st Sess. 1 (1961). An example cited in this Senate report of a gap which S. 860 filled was that section 114a only covered specific livestock diseases. S. 860 amended § 114a so that it covered all communicable diseases of livestock or poultry. *Id.* As stated above, however, it is clear in reviewing the legislative history that S. 860 and section 134a, created by it, were not intended to replace section 114a. *Id.* at 4, 7.

In addition to expanding the quarantine law coverage to all communicable diseases, S. 860 also expanded the Secretary of Agriculture's authority in certain areas. The Secretary's authority under section 114a was somewhat limited. The legislative history of S. 860 addresses the Secretary's authority under section 114a. It states:

> Under section 11 of the act of May 29, 1884, as amended (21 U.S.C. 114a) the Secretary is authorized, either independently or in cooperation with States, the District of Columbia, Puerto Rico, and the Territories and possessions of the United States, certain organizations, and individuals, to control and eradicate specified diseases of animals (including poultry), incipient or potentially serious minor outbreaks of animal diseases, and contagious or infectious diseases of animals which are deemed to constitute an emergency and threaten the livestock indus-

try, including the payment of claims growing out of the destruction of animals (including poultry), and materials, affected by or exposed to any such disease. *This section contemplates a program in which participation by the owner of the animals and materials is voluntary so far as the Federal Government is concerned.* [*Id.* at 4.] [Emphasis added.]

Case law construing the Secretary's authority under section 114a emphasizes the limit on the Secretary's ability to act under that section and emphasized the need to expand and more clearly define his authority. *See Thornton v. United States*, 271 U.S. 414, 424–25, 46 S.Ct. 585, 588, 70 L.Ed. 1013 (1926); *Whipp v. United States*, 47 F.2d 496 (6th Cir.1931) (both cases emphasize necessity for livestock connection to interstate commerce or cooperation with State government before the Secretary could act). *See also Reid v. Colorado*, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108 (1902). In *Reid*, the Court stated the rules and regulations under the precursor to section 114a had no binding force upon the states. *Id.* at 147, 23 S.Ct. at 96. The Court continued:

> They [these rules and regulations] were to be certified to the executive authority of each State, and the cooperation of such authorities in executing the act of Congress invited. If the authorities of any State adopted the plans and methods devised by the Department, or if the State adopted measures of their own which the Department approved, then the money appropriated by Congress could be used in conducting the required investigations and in such disinfection and quarantine measures as might be necessary to prevent the spread of diseases in question from one State * * * to another. *Id.* at 147–48, 23 S.Ct. at 96.

The Supreme Court made it clear that Congress did not intend to override the police power of a State without its cooperation. *Id.* at 148, 23 S.Ct. at 96. This case law brought out the limits on and confusion surrounding the Secretary's authority to

act regarding the quarantine and inspection of livestock. Section 114a was not aimed specifically at interstate commerce and when the Secretary sought to act within a State the owner's cooperation appeared imperative.

S. 860 granted the Secretary additional authority regarding animals brought into this country or moving in interstate commerce. Specifically the bill would:

(1) authorize seizure, quarantine, and disposal of animals—

(A) moved or handled in interstate or foreign commerce contrary to Federal quarantine laws and regulations,

(B) moved into the United States or interstate while affected with or exposed to a communicable disease dangerous to livestock or poultry, or

(C) affected with or exposed to an extremely dangerous disease creating an extraordinary emergency, but only if State or other authorities are not taking adequate measures (and in such case seizure, quarantine and disposal of carcasses of such animals and contaminated products and articles would also be authorized) * * *.

S.Rep. No. 582, supra, at 2. S. 860 was designed to grant the Secretary specific authority in two situations: (1) when imported livestock or livestock moving in interstate commerce are involved, or (2) in a case in which the Secretary determines an extraordinary emergency exists. However, "[t]he authority of [§ 134a(a)–(b) ] is not dependent on cooperation of any State or other jurisdiction or organization or individual." Id. at 4. This lack of necessity for cooperation distinguishes section 134a from section 114a. Additionally, section 134a can be distinguished from section 114a in that absent an extraordinary emergency section 134a grants no authority to act intrastate with or without cooperation. See Julius Goldman's Egg City v. United States, 1 Cl.Ct. 1051, 697 F.2d 1051 (1983) (secretary relied on emergency power of

section 134a(b) but the case underscores viability of both sections 114a and 134a).

Once it is concluded that sections 114a and 134a address somewhat distinct areas concerning quarantine and disposal of animals, it is also reasonable to conclude that their measures of indemnity likewise can rationally be different. Section 134a(d) bases compensation on fair market value of the animal. Section 114a directs the Secretary to act "in accordance with such regulations as [he] may prescribe." Those regulations were promulgated and are currently found at 9 C.F.R. § 50 (1984). These regulations call for a payment to owners of a maximum of $750 for affected cattle and $450 for exposed cattle. 9 C.F.R. § 50.3 (1984).

The court opines that the difference in the two prescribed indemnity payments mandated by section 134a and 114a and accompanying regulations can be explained by the context in which the Secretary is operating. It is apparent under section 114a that State and Federal cooperation is needed. See Reid v. Colorado, supra. See also 9 C.F.R. § 50.2. Under such a cooperative program both State and Federal indemnification should be forthcoming. The amounts promulgated under 9 C.F.R. § 50.3 were most probably designed so that, when added to state indemnity payments, the total would approximate the appraised value of the animal. Under section 134a, however, when the Secretary is acting based on interstate movement or extraordinary emergency, it is less likely that any State indemnification would be paid due to potential disputes between the states from and into which the cattle moved over which one should pay and thus compensation based on fair market value is more appropriate. It should be noted that if any State indemnification is paid, compensation under section 134a(d) must be reduced if the awards of both Federal and State agencies exceed the fair market value of the animals destroyed.[6]

---

6. Plaintiff's counsel admitted at oral argument that he has not brought a claim against the State for indemnification. Though bringing a claim

against the State is not necessarily a prerequisite to Federal indemnification, both sections 134a and the regulations promulgated pursuant

The court, therefore, concludes that sections 114a and 134a were designed to grant the Secretary of Agriculture authority in two essentially distinct areas. Section 134a was not intended to replace section 114a. S. 860 did amend section 114a but that amendment only added language so that section 114a would apply to *all* communicable diseases. *See S.Rep. No.* 582, *supra,* at 7. Clearly this demonstrates Congressional intent to continue the viability of section 114a.

Given these determinations, the court must reject plaintiff's argument that 9 C.F.R. § 50.3 is in direct conflict with section 134a and must be found invalid. In support of this argument plaintiff cites *Scofield v. Lewis,* 251 F.2d 128 (5th Cir. 1958). In *Scofield* a statute was amended so that it conflicted with existing regulations concerning the same matter and the court found the regulations invalid. *Id.* at 132. In this case, the court has determined that sections 114a and 134a are separate. Therefore, there can be no conflict between section 134a and the regulations promulgated pursuant to section 114a. The only amendment to section 114a in S. 860 relating to the coverage of all communicable diseases did not alter the indemnification method chosen.

Plaintiff also contends that the case of *Cumberland v. Department of Agriculture,* 537 F.2d 959 (7th Cir.1976) is controlling in this case. In *Cumberland,* the plaintiffs sought compensation for diseased swine destroyed at the direction of the Department of Agriculture. Compensation had been denied because the plaintiffs had transported the swine in interstate commerce in violation of certain transportation restrictions. It was undisputed, however, that the plaintiffs were unaware of the transportation restrictions or of their violations. *Id.* at 959–60.

In denying compensation in the *Cumberland* case, *supra,* the government relied upon 9 C.F.R. § 56.8(b) (1983) which disallowed all claims for compensation if the claimant failed to comply with any Department regulation. This regulation was promulgated under 21 U.S.C. § 114a. The plaintiffs contended, however, that they were entitled to compensation because under 21 U.S.C. § 134a(e), compensation is required unless the claimant has "knowingly" violated a pertinent law or regulation.

The *Cumberland* court found that 9 C.F.R. § 56.8(b) conflicted with section 134a(e). The court also found that the movement of the swine in *Cumberland* brought the case under section 134a(a). 537 F.2d at 961. Section 134a(d) requires compensation at fair market value unless the exception in section 134a(e) of a "knowing" violation of a pertinent law or regulation applies. The court found no such exception applicable. The court also found that section 134a(e) contemplates some overlap between sections 114a and 134a(e). 537 F.2d at 961. In the case of such overlap then *Scofield v. Lewis, supra,* controls and the regulation must give way to the statute.

The court accepts the *Cumberland* holding and rationale. However, *Cumberland* was clearly a case under 134a(a), and there was clearly a conflict between the statute and the regulation relied on in that both could have applied in that situation. In this case, as the court will subsequently discuss, the situations set out in section 134a(a) are not present. This fact, combined with the court's earlier finding that the compensation provisions of sections 114a and 134a do not conflict makes this case distinguishable from *Cumberland.* The overlap present in *Cumberland* does not exist in this case.

The court is of the view that section 134a does not apply in this case, for reasons

to section 114a make it clear that the combined State and Federal indemnifications cannot exceed the animals' fair market value. Therefore, State indemnification was anticipated by Congress to be forthcoming in some instances. Mississippi does have a statute which may entitle an

owner to partial indemnification for destroyed cattle. *Miss.Code Ann.* § 69–15–211 (1972). Plaintiff's counsel assured the court that he will file an action against the State, but he was not optimistic about any recovery from the State.

which will be discussed, *infra*, in that the prerequisites in section 134a(a) & (b) are not present. From that determination, it is reasonable to conclude that it is appropriate to apply the indemnification method set out in 9 C.F.R. § 50.3. The *Cumberland* court, when considering the facial invalidity of 9 C.F.R. § 56.8(b) upon the passage of section 134a, stated:

> We do not hold that 9 C.F.R. § 56.8(b) is facially invalid but rather hold that it may not be validly applied to prohibit compensation in cases where section 134a provides authority to dispose of livestock. Conceptually, at least, cases could exist where section 114a would provide the Secretary with authority to act but section 134a would not. Our holding in this case does not prohibit the Secretary from applying section 56.8(b) in such a situation. * * * [*Cumberland v. Department of Agriculture, supra*, 537 F.2d at 961–62.]

This further supports the court's conclusion that, in this case, it is proper to utilize section 114a and the regulations promulgated pursuant to it to arrive at the proper measure of compensation for the destroyed cattle.

■ The only issue remaining for the court to discuss regarding the proper compensation to be awarded the plaintiff is a consideration of which statutory provision applies, section 114a or 134a. As stated previously, the court is of the view that section 134a does not apply in this case. Thus, section 114a is deemed the applicable statutory provision in this case. In arriving at this conclusion it is appropriate to set out initially the arguments of both sides. Plaintiff's position is essentially that a broad concept of interstate commerce should be applied in this case and that any animal which defendant could regulate under such a broad concept should fall within the pale of section 134a. Thus, plaintiff argues, upon the destruction of animals, compensation should be based on the animals' fair market value. Defendant, on the other hand, maintains that the focus should be on the statutory language of each section and the circumstances of each

case to determine which section applies, which, in turn, will determine the proper measure of compensation.

The court acknowledges the broad development of the commerce clause and the extensive amount of regulations promulgated in the name of interstate commerce. It is also true that at least one court has labelled the powers of the Secretary under section 134a as "broad." *See Barton v. United States Department of Agriculture*, 523 F.Supp. 1019, 1021 (S.D.Ill.1981), a case relied on by plaintiff at oral argument. However, the court concludes the breadth of section 134a is limited by the requisites of said section and thus the complete pervasiveness of the commerce clause cannot be utilized to enable the USDA to do whatever it wishes under section 134a.

The *Barton* case, *supra*, in which an owner sought to enjoin the Secretary from requiring her to dispose of certain horses by either destroying them or removing them from the United States, is distinguishable from the case at bar. In *Barton*, plaintiff had clearly violated a regulation which prohibited the importation into the United States of horses which had been in the Federal Republic of Germany within 12 months prior to their importation. There existed at the time in the Federal Republic of Germany a contagious equine disease. Therefore, section 134a(a)(1) clearly applied in *Barton* because the cattle had moved in foreign commerce in violation of a regulation precluding such movement from a contagious diseased area. As will be discussed, *infra*, 134a(a)(1) does not apply in this case.

As to plaintiff's claim that section 134a grants the USDA with the authority to act to prevent the dissemination of communicable diseases to the fullest extent permitted by the interstate commerce clause, the court cannot concur. The requirements of section 134a(a) dictate the specific instances in which the Secretary may abandon the cooperative procedures of section 114a. All three subsections of section 134 focus on *movement* interstate, either present or

past tense. The language of section 134a and its legislative history indicate that if the requisites of section 134a are not present, then the USDA is forced to act under section 114a or other applicable sections.

Having arrived at these general conclusions, it is now necessary to analyze section 134a(a) and (b) to determine if plaintiff's cattle meet any of the requirements of those sections. Subsection 134a(a) provides:

(a) The Secretary, whenever he deems it necessary in order to guard against the introduction or dissemination of a communicable disease of livestock or poultry, may seize, quarantine, and dispose of, in a reasonable manner taking into consideration the nature of the disease and the necessity of such action to protect the livestock or poultry of the United States: (1) any animals which he finds are moving or are being handled or have moved or have been handled in interstate or foreign commerce contrary to any law or regulation administered by him for the prevention of the introduction or dissemination of any communicable disease of livestock or poultry; (2) any animals which he finds are moving into the United States, or interstate, and are affected with or have been exposed to any communicable disease dangerous to livestock or poultry; and (3) any animals which he finds have moved into the United States, or interstate, and at the time of such movement were so affected or exposed.

Subsection 134a(b) provides the Secretary with the authority to seize, quarantine, and dispose of any animals affected with or exposed to disease to the extent that he concludes an extraordinary emergency exists which is a threat to the nation's livestock or poultry.

It is clear in this case that such a national emergency as is contemplated in subsection 134a(b) did not exist and the Secretary did not declare such an emergency. It is also obvious that this is not a case concerning animals moving into the United States. It is also not a case of the movement of animals in violation of any pertinent law or regulation. There is no indication that the Secretary found the animals (in this case cattle) in question were affected with or exposed to disease when they *moved* in interstate commerce. That leaves one issue: whether or not the animals in this case were moving in interstate commerce at the time it was discovered that they were affected with or exposed to tuberculosis.[7]

Section 134a specifically uses the language "moving * * * interstate". In *United Parcel Service v. Armold*, 218 Kan. 102, 542 P.2d 694 (1975), the court stated, "movement in interstate commerce requires property to actually move and does not refer to those items of tangible personal property which are stationary." *Id.* 542 P.2d at 699. In this case it is undisputed that at the time of the detection of the disease, all the animals were on the plaintiff's farm. The United States Supreme Court has stated: "Importation into one State from another is the indispensable element, the test, of interstate commerce. * * *" *Furst & Thomas v. Brewster*, 282 U.S. 493, 497, 51 S.Ct. 295, 296, 75 L.Ed. 478 (1931). *See also United States v. Hill*, 248 U.S. 420, 423–24, 39 S.Ct. 143, 144–45, 63 L.Ed. 337 (1919). In *Thornton v. United States, supra,* the herd of cattle involved were located near a state line. The Court found that the

---

7. Plaintiff's counsel claimed at oral argument that all three subparts of section 134a(a) were applicable to plaintiff. Counsel asserted that the cattle were in violation of a law or regulation because they were diseased. However, this ignores the other requirement that the animals are moving or have moved in interstate or foreign commerce contrary to any law or regulation. The key issue becomes whether the animals could be considered moving in interstate commerce at the time they were affected with or exposed to tuberculosis. Since there is absolutely no evidence submitted by either party, nor is it so alleged, that these animals were affected or exposed to disease when they *moved* onto plaintiff's farm, the only issue remaining is whether they were considered to be *moving* in interstate commerce in some manner at the time the disease was detected.

crossing of the cattle by themselves over the state line is interstate commerce. *Thornton v. United States, supra,* 271 U.S. at 425, 39 S.Ct. at 145. In this case there were no such crossings of state lines. In fact in one of his supplemental affidavits, plaintiff states that his farm is 7 miles from the state line.

Plaintiff initially argues that the first cow discovered to have tuberculosis was a cow sold by plaintiff in interstate commerce. This is true. However, plaintiff was no longer the owner of the diseased animal at the time of this discovery, so it cannot receive compensation for it. The fact that one of his cows moved in interstate commerce does not mean all of his cattle were so moving. *Cf. Hooks v. Nashville Breeko Block & Tile Co.,* 39 F.Supp. 369, 371 (M.D.Tenn.1941). The fact that he sold milk in interstate commerce is also not relevant. Subsection 134a(a) specifically focuses on the *animals* moving interstate. In this case they were not.

In a belatedly filed affidavit, plaintiff attempted to buttress his argument that the nature of his herd of cattle was such that it met the prerequisite of section 134a(a) and therefore entitled him to the fair market value of his cattle. Plaintiff first points out the fact that he leased 92 cattle from Consolidated Enterprises 6 weeks prior to the first visit to his farm by USDA officials. These leased cattle, he claims, had to move interstate to arrive at his farm.

The pertinent part of section 134a(a) states: " * * * (3) any animals which he [the Secretary] finds have moved into the United States, or interstate, and at the time of such movement were so affected or exposed." The court will assume that these leased animals were affected with tuberculosis when moved in interstate commerce. Section 134a(a) focuses solely on the animals moved and not on the animals the moving cattle subsequently encounter intrastate. Having assumed that these cattle were moving interstate while affected with tuberculosis then section 134a(d) applies. Section 134a(d) states that "the Sec-

retary shall compensate the *owner* of the animal * * * destroyed pursuant to the provisions of this section." (Emphasis added.) Section 134a(d) then mandates that compensation is to be based on the fair market value of the animal. In this case, the owner of the cattle which had moved in interstate commerce was the lessor and not plaintiff. Therefore, if anyone or any entity was arguably entitled to compensation based on fair market value, it was Consolidated Enterprises. This conclusion holds true as to the other 153 leased cattle mentioned in plaintiff's belated affidavit.

Plaintiff also points out in this third affidavit, submitted the day before oral argument, that over 2 years prior to the first visit by USDA officials in late January or early February 1983 to his farm, he had purchased some cattle outside of Mississippi. He did the same 3 years earlier from another out-of-state farmer as well. Neither the USDA nor the State of Mississippi at the time of these sales or at the time of their interstate movement found that these cattle which admittedly moved in interstate commerce were affected with or exposed to tuberculosis. Such a finding is essential in order to satisfy the requirements of section 134a(a). The mere fact that a portion of plaintiff's herd at one time moved in interstate commerce does not satisfy the requirements of section 134a(a) without more. When these animals were actually determined to be affected or exposed to tuberculosis, they were stationary on plaintiff's farm and not moving interstate. It should be noted that plaintiff did not allege in any of his affidavits that his cattle were moving or had moved interstate and at the time of such movement were affected with or exposed to tuberculosis.

Plaintiff argues that Congress could not have intended section 134a to only apply to diseased animals in transit. However, a review of the legislative history shows that this was the intent of Congress. In a letter from Acting Secretary, Charles S. Murphy to the Chairman of the Committee on Agriculture and Forestry, Mr. Murphy stated: "The bill [S. 860] would authorize the Sec-

retary of Agriculture to properly dispose of animals * * * which have been found on such movement [interstate] to be infected with or exposed to any communicable disease dangerous to livestock or poultry." *S.Rep. No.* 582, *supra,* at 3. In addition the Senate Report analysis of S. 860 stated, concerning subsection 134a(a): "Section 2(a) of the bill confers additional authority to seize, quarantine, and dispose of animals (including poultry) * * * *on the basis of the movement of the animals* into the United States or interstate while affected with or exposed to any communicable disease * * *."  *S.Rep. No.* 582, *supra,* at 4. *See also* 107 *Cong. Rec.* 1882 (1961) (statement of Sen. Humphrey) (focus on movement in interstate commerce and inability of states to handle major outbreaks of such diseases).

Discussion in the legislative history regarding the ability of Department of Agriculture employees to stop and inspect animals moving in interstate commerce also points up the intent of Congress that S. 860 be directed at animals in transit. *See Miscellaneous Hearing, on H.R. 3693 and S. 860 Before the Subcommittee on Livestock and Feed Grains of the House Committee on Agriculture,* 87th Cong. 1st Sess. 136, 138–39, 144–46 (March 19, 1962). 21 U.S.C. 134d (1982) contains the provisions for searching any means of conveyance moving in interstate commerce. The legislative history indicated the Congressional intent to direct section 134a predominately to animals actually moving interstate. Plaintiff's counsel admitted during

oral argument that the concern expressed in the legislative history was over the ability of the USDA to stop and search vehicles in transit for diseased animals. In this case the animals were not moving interstate and thus section 134a does not apply and properly was not utilized as a basis for compensation.

There is also overwhelming evidence that the Department of Agriculture was acting under section 114a. As stated above, the Secretary under section 114a is dependent upon cooperation of the individual states and the owners of involved animals. In this case the Secretary had entered into a Memorandum of Understanding with Mississippi in 1976. It is clear from the affidavits of several Department of Agriculture personnel that they were acting pursuant to 21 U.S.C. § 114a and the Memorandum of Understanding with Mississippi. The cooperation between the State and Federal governments included the commissioning of Federal personnel to carry out the purpose of Mississippi animal health statutes. *Miss.Code Ann.* § 69–15–13 (1972). Finally, as stated above, section 114a contemplates a program in which participation by the owners of the animals is voluntary as far as the Federal government is concerned. *See S.Rep. No.* 582, *supra,* at 4–5. In this case plaintiff signed an agreement to depopulate his herd. Dr. Charles D. Stumpff of the Department of Agriculture also signed the agreement. Therefore, the government sought and received the cooperation of the owner in this case.[8]

**8.** In his affidavit submitted belatedly with the court one day before oral argument, plaintiff, in paragraph 3, attempted to minimize the fact that defendant and the State of Mississippi were acting in a coordinated manner, a fact admitted to the court by plaintiff's counsel during oral argument. In his third affidavit, plaintiff pointed out that USDA officials identified themselves as such. He stated that these USDA representatives never stated they were acting pursuant to state law. Finally, he claimed one USDA official told him the State of Mississippi would not indemnify him for the loss of his cattle. It is the court's conclusion that these assertions do not alter the fact that defendant was acting in coordination with the State of Mississippi.

First, the fact that USDA representatives were acting pursuant to the state law does not alter their status as USDA employees. Second, the court does not find it incumbent upon USDA officials to indicate under which authority they are operating under the circumstances of this case. In any event, the court finds that the "Official Quarantine Notice" was issued by the State to plaintiff. Further the agreement plaintiff signed regarding depopulation of his herd for indemnity payments was entered into with State and Federal officials. Finally, both State and Federal personnel were involved in the inspection of plaintiff's cattle. These facts were sufficient to put plaintiff on notice that Federal and State coordination was involved in the

The court is persuaded that the Secretary was acting pursuant to section 114a. Further, the Secretary is charged with the responsibility of implementing both sections 114a and 134a. In applying these sections to particular circumstances, the Secretary's construction and application thereof should be accepted unless there are compelling indications that such is wrong. *See Julius Goldman's Egg City v. United States, supra,* 697 F.2d at 1054–55 and cases cited therein. *See also Barton v. United States Department of Agriculture, supra.*

■ During oral argument, plaintiff's counsel argued that the Secretary abused his discretion in applying section 114a (and its applicable regulations) instead of section 134a. Plaintiff's counsel speculated that the USDA simply acted to quarantine plaintiff's farm (counsel forgot that the State quarantined plaintiff's farm) and acquired his agreement to depopulate his herd and then subsequently chose an indemnification method which would least deplete government coffers. It is well established that there exists a strong presumption that government officials act properly. *See Eagle Constr. Corp. v. United States,* 4 Cl.Ct. 470, 479 (1984); *P. Francini & Co. v. United States,* 2 Cl.Ct. 7, 11 (1983); *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 64–65, 617 F.2d 590, 597 (1980); *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978). To overcome this presumption requires "well-nigh irrefragable proof." *See Carrier Corp. v. United States,* 6 Cl.Ct. 169 at 176 n. 2 (1984); *American General Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 374, 587 F.2d 54, 59 (1978); *Knotts v. United States,* 148 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954). In this case plaintiff has submitted no proof in support of his allegation that the Secretary abused his discretion. The presumption mentioned above has not been tarnished at all. This fact, combined with the court's conclusion that defendant was properly acting under section 114a, leads the court to uphold the Secretary's determinations in that they were not arbitrary, unreasonable or irrational. The court, therefore, concludes that plaintiff received the proper compensation for his destroyed animals and is entitled to no further indemnity payment.

Plaintiff's motion for partial summary judgment is denied and defendant's motion for summary judgment on the issue of indemnity is granted.

### B.

In addition to plaintiff's claim for additional compensation to indemnify him for his destroyed cattle, plaintiff also asserts several other claims which he maintains entitles him to still additional compensation. Plaintiff in his motion for partial summary judgment reserved the right to litigate these claims subsequently. Defendant in its motion for summary judgment requests the court to dismiss said claims now. The court is of the opinion that it can address such claims at this time. The court upon consideration of these matters has concluded that these additional claims also should be dismissed.

■ The first of these additional claims is that plaintiff was required by Department of Agriculture personnel to transport his cattle to a slaughterhouse further from plaintiff's farm than the slaughterhouse plaintiff desired to employ. As a result,

---

quarantine and herd depopulation actions at issue in this case.

Finally, plaintiff claims that a USDA official told him that no State indemnity was available. The court finds that the rule of *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 383–85, 68 S.Ct. 1, 2–4, 92 L.Ed. 10 (1947), applies in this case. Therefore, plaintiff is charged with knowledge of such State statutes. In any event, such statements are immaterial. The issue in this case is what rate of compensation plaintiff is entitled to

from the Federal government. Such a rate is determined by ascertaining whether section 134a or 114a and the regulations promulgated pursuant thereto applies. Both section 134a(d) and the regulations under section 114a anticipate that some State indemnification may be forthcoming. Thus, whether a state does or does not compensate animal owners for the loss of their animal is of little relevance in ascertaining whether section 134a or 114a is to apply.

plaintiff alleges that he incurred more transportation costs than he would have paid if the closer facility had been utilized. Plaintiff also claims that the slaughterhouse actually employed paid less in salvage value than the closer company would have paid.

Defendant addressed this claim by submitting the affidavit of Dr. Charles D. Stumpff who, plaintiff alleges, "insisted" plaintiff send the cattle to the more distant slaughterhouse. Dr. Stumpff denied that he or any Agriculture personnel insisted or asked the plaintiff to use the particular slaughterhouse in question. Clearly, the court cannot dismiss plaintiff's claim based on this affidavit alone. In this case, however, the court finds that whether or not Dr. Stumpff or other agency personnel required plaintiff to utilize the more distant slaughterhouse is immaterial and plaintiff's claim for damages resulting from such alleged insistence must be dismissed. It would be unrealistic to have a trial on this matter under these circumstances. *See Frangella Mushroom Farms, Inc. v. United States,* 229 Ct.Cl. 578, 583 (1981).

A review of the regulations which govern the slaughtering of diseased animals indicates that the Department of Agriculture has no authority to dictate which slaughterhouse is utilized by the owner of the cattle. *See* 9 C.F.R. § 50.7. This is confirmed by Dr. Stumpff in his affidavit of September 8, 1984. The only point the government may insist upon is that the slaughtering establishment be under Federal or State inspection. Therefore, even assuming Dr. Stumpff insisted that the plaintiff employ the more distant slaughterhouse, he had no authority to do so.[9]

Once it is established that no Department of Agriculture employee had authority to direct the plaintiff to use a particular slaughterhouse, then it follows that any claim based on such alleged behavior by a government official is precluded. It is well established that individuals who incur damages as the result of unauthorized acts or representations of government agents may not recover from the government. *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 85, 591 F.2d 629, 635 (1979); *Jackson v. United States,* 216 Ct.Cl. 25, 41–42, 573 F.2d 1189, 1197 (1978); *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 383–85, 68 S.Ct. 1, 2–4, 92 L.Ed. 10 (1947). It is clear that all those who deal with government agents are charged with knowledge of the regulations which govern their dealings. *Federal Crop Ins. Corp. v. Merrill, supra,* 332 U.S. at 384–85, 68 S.Ct. at 3–4. In addition, "one who deals with the Government assumes the risk that the officials with whom he deals have no authority." *Thanet Corp. v. United States, supra,* 219 Ct.Cl. at 85, 591 F.2d at 635. In this case, therefore, plaintiff was charged with knowledge that the only requirement the government could impose was that he utilize a Federal or State inspected facility. This claim based on the alleged insistence of Dr. Stumpff that plaintiff must use a

---

9. In one of his supplemental affidavits plaintiff claims that the basis of Dr. Stumpff's insistence that he utilize the more distant slaughterhouse was his concern that the closer slaughterhouse could not destroy the cattle within 2 weeks. The court recognizes that Dr. Stumpff in his affidavit denies insisting that plaintiff use any particular slaughterhouse. In addition, the court finds no authority for USDA officials to order the use of any particular facility. However, assuming that Dr. Stumpff did suggest that plaintiff utilize a slaughterhouse other than the one nearby, he would have done so presumably to preserve plaintiff's indemnity.

Under 9 C.F.R. § 50.7 any "[a]nimals for which Federal indemnity may be paid because of tuberculosis must be destroyed * * * within 15 days after the date of appraisal * * *." This

15–day period may be extended by the appropriate Veterinarian in Charge for reasons satisfactory to him for 30 days if a request is received by him prior to the expiration of the allowed 15–day period. 9 C.F.R. § 50.7. If this section of the regulations is not complied with no indemnification need be paid. 9 C.F.R. § 50.14. Thus, in this case Dr. Stumpff's suggestion that plaintiff not use the closer slaughterhouse would be for plaintiff's benefit. As it turned out, plaintiff admits it was some 5 weeks later before all the cattle were destroyed. Under section 50.14, this fact could negate any necessity on the part of defendant to pay any indemnity pursuant to 9 C.F.R. Part 50. Therefore, one could argue defendant actually paid plaintiff much more than was required under the pertinent regulations.

particular slaughterhouse must be dismissed. *See also Heckler v. Community Health Services,* — U.S. —, 104 S.Ct. 2218, 2225–27, 81 L.Ed.2d 42 (1984); *Thoen v. United States,* 5 Cl.Ct. 823, 829 (1984).

Further, authority to support the court's conclusion that plaintiff cannot rely on ignorance of the applicable regulation, that he cannot rely on the assertion that USDA officials misrepresented the law as to the lack of State indemnity, and that he cannot rely on the assertion that he shipped his cattle to a more distant slaughterhouse because of the unauthorized alleged insistence of a USDA official, can be found in *Mills v. United States,* 187 Ct.Cl. 696, 410 F.2d 1255 (1969). In *Mills v. United States, supra,* the plaintiff was an elderly, uneducated widow. The plaintiff was negotiating for the sale of her land to the government. She alleged that the government misstated the law causing her to accept less for her land than she may have otherwise received. The court initially stated: "In the absence of unusual circumstances, representations as to question of law form no basis for setting aside a contract." *Id* at 700, 410 F.2d at 1257. In that case the court did not find the fact that an elderly widow was negotiating with the government over the sale of her land to constitute "unusual circumstances." The court in this case similarly finds no unusual circumstances. Therefore, if any of the actions of the government can be considered misrepresentations of law they form no basis of recovery in this case.

In *Mills v. United States,* the plaintiff did not have an attorney during the land sale negotiations. Plaintiff relies on the fact he had no legal assistance at the times in question. Regarding this fact the court stated in pertinent part:

> Ordinarily one having need of legal advice will retain counsel and not take it from the other side of the negotiating table. Purchase and sale of real estate is a kind of transaction where retention of counsel is ordinary and usual. The relationship of the parties was not such that it was reasonable for one side to have

relied on the representations of the other. [187 Ct.Cl. at 700, 410 F.2d at 1258.] The court is of the opinion that plaintiff, faced with the total destruction of his dairy herd with its certain detrimental economic impact, should have sought counsel in this case. This was especially true when he was requested to sign the depopulation agreement. In fact, during oral argument, plaintiff's counsel constantly emphasized that plaintiff was faced with grave economic hardship and few choices which indicates that legal advice was warranted. Therefore, as stated in *Mills v. United States, supra,* plaintiff should have obtained the assistance of counsel and should not now be able to complain based on undesired results of which counsel could have made him aware.

■ The plaintiff also asserts a claim based on losses suffered during the downtime of his dairy business. During the quarantine and subsequent required disinfection of the business premises plaintiff claims that it suffered lost profits due to an inability to utilize equipment and the necessity of purchasing milk from other producers to meet its supply contract requirements.

The destruction of the animals by the governments, Federal/State, can be analogized to the taking of property. In fact there is a strong similarity between the two governmental acts. In this case both the destruction of the cattle and the required temporary closing of plaintiff's farm are analogous to takings. The basic rule regarding lost profits in taking cases is that they are not compensable. *See United States v. General Motors Corp.,* 323 U.S. 373, 379–80, 65 S.Ct. 357, 360–61, 89 L.Ed. 311 (1945). *See also Yuba Goldfields, Inc. v. United States,* 1 Cl.Ct. 421, 427 n. 1 (1983); *Jaffe v. United States,* 220 Ct.Cl. 666, 668 (1979) (order) (consequential damages not compensable); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958).

Further analogous support for refusal to recognize plaintiff's claim for lost profits

can be found in contract cases involving the government. In such cases the general rule states a contractor is not entitled to recover lost profits as a portion of damages unless he can prove that such lost profits were an immediate and direct result of defendant's breach. *See Neely v. United States,* 152 Ct.Cl. 137, 146–47, 285 F.2d 438, 443 (1961) (recognition of uncertainty of profits limits their use in arriving at damages to those cases where breach is proximate cause of their loss); *Henry L. Crowley & Co. v. United States,* 143 Ct.Cl. 812, 824, 166 F.Supp. 750, 757 (1958). The reason such losses are generally not recoverable is because they are too speculative and remote. *See William Green Constr. Co. v. United States,* 201 Ct.Cl. 616, 626, 477 F.2d 930, 936–37 (1973); *Dale Constr. Co. v. United States,* 168 Ct.Cl. 692, 738 (1964); *Ramsey v. United States,* 121 Ct.Cl. 426, 433–35, 101 F.Supp. 353, 357–58 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952).

In this case plaintiff's assertion that he suffered lost profits as the direct result of the depopulation of his herd is speculative. It would be impossible to demonstrate absent the destruction of the herd that plaintiff could continue to sell cattle and milk from a herd infected with tuberculosis. Secondly, the actions of the government were at most a remote cause of plaintiff's lost profits. In this case the proximate cause of plaintiff's losses was the fact that his herd contracted tuberculosis. *See Ramsey v. United States, supra,* 121 Ct.Cl. at 433, 101 F.Supp. at 357.

Based on these analogous cases the court believes dismissal of plaintiff's similar claim based on lost profits is appropriate as a matter of law.

Finally, plaintiff has asserted a claim for additional transportation charges incurred for transporting his cattle to the slaughterhouse. It is undisputed that plaintiff received $2,069.72 reimbursement for a portion of his transportation expenses. This amount equals one-half the cost of transporting the 195 affected cattle to slaughter. Such reimbursement is consistent with the regulations. *See* 9 C.F.R. § 50.8. Apparently, plaintiff contends that the regulations relating to reimbursement of transportation costs are unconstitutional.

It is clear that statutes and regulations promulgated thereunder similar to those in question here have been upheld as constitutional. *See Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928); *Thornton v. United States,* 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013 (1926). In *Miller v. Schoene,* a state law required the owners of all diseased cedar trees within two miles of apple orchards to destroy their trees. This statute had no provision for compensating the owner for such a loss. The United States Supreme Court upheld the law as a proper exercise of the state's police power.

The United States Supreme Court has also stated that regulations promulgated under the authority of the commerce clause often have the quality of police regulations. *See Currin v. Wallace,* 306 U.S. 1, 11–12, 59 S.Ct. 379, 385, 83 L.Ed. 441 (1939). Given this conclusion it is not unreasonable for this court to look to cases like *Miller v. Schoene* for precedent on the constitutionality of the regulations employed in this case.

State courts have long ruled that animals suffering from contagious diseases which threaten the health of other animals and humans may be destroyed by the state without full compensation.[10] *See Torrvella v. Fernandez,* 14 P.R.R. 591 (1908); *New Orleans v. Charouleau,* 121 La. 890, 46 So. 911 (1908); *Livingston v. Ellis County,* 30 Tex.Civ.App. 19, 68 S.W. 723 (1902). The basic reasoning used by many state courts in supporting this exercise of police power without compensation is that such diseased animals are obnoxious to the public health to the degree that the animals are a public

---

**10.** Though he made no statement concerning the amount of compensation, plaintiff's counsel did admit that the state pursuant to its police power could have acted to destroy these diseased cattle if the Federal government had not acted with the state's cooperation.

nuisance. The courts then conclude that states need not compensate individuals for the abatement of such a nuisance. *See Kroplin v. Truax,* 119 Ohio St. 610, 165 N.E. 498 (1929); *State ex rel. Spillman v. Heldt,* 115 Neb. 435, 213 N.W. 578 (1927); *Knox County v. Kreis,* 145 Tenn. 340, 236 S.W. 1 (1922); *New Orleans v. Charouleau, supra; Torrvella v. Fernandez, supra.*

The United States Supreme Court has also adopted the above reasoning that when acting under the state police power to abate a nuisance no compensation is necessary. The case most directly on point is *Lawton v. Steele,* 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894). In *Lawton,* the Supreme Court upheld a New York statute which declared certain fishing practices illegal. The statute declared specific fishing devices a public nuisance which could be summarily destroyed by any person including game constables. Finally, the statute provided that no action for damages shall lie for such destruction. *Id* at 135, 14 S.Ct. at 500. The Court upheld this statute as a legitimate exercise of the state's police powers. *Accord Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Northwestern Laundry v. Des Moines,* 239 U.S. 486, 36 S.Ct. 206, 60 L.Ed. 396 (1916); *Hadacheck v. Los Angeles,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887); *Fertilizing Co. v. Hyde Park,* 97 U.S. 659, 7 Otto 659, 24 L.Ed. 1036 (1878).

The diseased animals in this case can reasonably be considered a public nuisance. It follows then that no compensation for the destruction of these animals was required. However, Congress acting under the commerce clause in passing essentially a police regulation saw fit to compensate owners in part for their loss. In promulgating the regulations the Department of Agriculture decided to partially reimburse the owner for his transportation costs. Clearly, given the above case law, partial payment for such transportation costs is all plaintiff could hope for under the circumstances.

The court, therefore, concludes that if no compensation or reimbursement was necessary then that which has been conferred on plaintiff by the applicable statutes and regulations in this case is all that he is entitled to receive. This court is without authority to increase that amount absent a legal basis for doing so. Thus dismissal of plaintiff's claim for additional transportation costs is appropriate as a matter of law.

### III.

### Conclusion

The court concludes that plaintiff's motion for partial summary judgment is denied and defendant's motion for summary judgment is granted, with plaintiff's complaint to be dismissed.